[Crim. No. 18044. In Bank. June 30, 1975.]

In re RUDOLFO A. RODRIGUEZ on Habeas Corpus.

## Counsel

Sidney M. Wolinsky, J. Anthony Kline, Gilbert Graham, Laurence R. Sperber, Charles C. Marson and Joseph Remcho for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Respondent.

## Opinion

WRIGHT, C. J.—Petitioner, who has served 22 years of an indeterminate sentence of one year to life for violation of Penal Code section 288,[1] seeks a writ of habeas corpus to obtain his release from prison. He contends that the statutory life maximum term is disproportionate to the offense and thus violates both the Eighth Amendment to the United

---

[1] Section 288: "Any person who shall wilfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in part one of this code upon or with the body, or any part or member thereof, of a child under the age of fourteen years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, shall be guilty of a felony and shall be imprisoned in the State prison for a term of from one year to life."

Unless otherwise stated, all statutory references are to sections of the Penal Code.

States Constitution[2] and article I, section 17 (formerly § 6)[3] of the California Constitution; that the 22 years he has served is likewise excessive punishment; and that the Adult Authority (hereafter Authority) has abused its discretion both in failing to fix a lesser term than the statutory life maximum term and discharge him therefrom and in failing to grant him parole. As we shall explain below, we have concluded that the penalty provision of section 288 is not unconstitutional. We have also concluded, however, that the Authority has failed to properly interpret and administer the Indeterminate Sentence Law and that although petitioner is not necessarily entitled to be released on parole, he is, nonetheless, entitled to be discharged from his term.

### The Background of Petitioner's Incarceration

In October 1952 petitioner pleaded guilty to violating section 288. Pursuant to the command of the Indeterminate Sentence Law, section 1168,[4] the court did not fix the punishment but sentenced petitioner to the term fixed by law, one year to life in the state prison. Although the circumstances of the offense involved no aggravating factors,[5] and

---

[2]The Eighth Amendment reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

[3]Section 17: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." Prior to the constitutional revision of November 5, 1974, the provision was included in section 6 of article I, which provided: "All persons shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed; nor shall cruel or unusual punishments be inflicted. Witnesses shall not be unreasonably detained, nor confined in any room where criminals are actually imprisoned."

Nothing in the legislative counsel's analysis, in the arguments for and against the revisions, or in the Secretary of State's official description of the ballot measure suggests that the simplified wording of section 17 was intended to make any substantive change in the content or interpretation of the provision. (Ballot Pamphlet, Proposed Amends. to Cal. Const., Gen. Election (Nov. 5, 1974) pp. 26-28.) The parties do not contend otherwise.

[4]Section 1168: "Every person convicted of a public offense, for which imprisonment in any reformatory or state prison is now prescribed by law shall, unless such convicted person be placed on probation, a new trial granted, or the imposing of sentence suspended, be sentenced to be imprisoned in a state prison, but the court in imposing the sentence shall not fix the term or duration of the period of imprisonment. [¶] ... "

[5]Records of the Department of Corrections, provided by respondent pursuant to California Rules of Court, rule 60, and lodged as exhibits, confirm petitioner's claims in this regard. They reveal the following facts regarding the commission of the offense. On the afternoon of April 20, 1952, petitioner and his wife were driving in their automobile when they saw six-year-old Salley roller skating. Petitioner stopped the car, got out, picked the girl up and put her on the front seat of the car next to his wife. They drove to a less public place where petitioner fondled the child's private parts. Petitioner's wife, who was present throughout, repeatedly assured Salley that she would not be hurt. When curious citizens investigated the parked car, they found that the child's skirt was raised above her

petitioner's personal history reflected none of the characteristics associated with vicious criminality,[6] and even though his conduct in prison was exemplary for a period of many years,[7] he has never been released on parole. The Authority has never fixed his term at less than maximum and for 16 of the 22 years he has been imprisoned, petitioner has been held at San Quentin, a maximum security prison.

Petitioner's claims must be examined in light of the background described above and with an understanding of the Indeterminate Sentence Law, a statutory scheme which encompasses both the administrative framework for term-fixing and parole-granting and also those provisions of the various codes which establish prison terms as punishment for felonies.[8] Before undertaking this examination it should be emphasized that we do not here consider the wisdom of the indeterminate sentence philosophy, nor are we here concerned with whether the goals the Indeterminate Sentence Law sought to achieve have been or are capable of being achieved. These questions are properly matters of

knees and that petitioner's trousers were unzipped. At the preliminary hearing the prosecution's expert medical witness testified that his examination showed no penetration of the sexual organs of the victim.

[6]Petitioner was 26 when he committed the offense. He had an I.Q. of about 68, and was functionally illiterate and unskilled. Psychiatric evaluations suggested that he was motivated to succeed but was frustrated because he was ill equipped for any but simple tasks. He had been arrested at age 19 and charged with attempted statutory rape, and two years later was arrested for molesting a child. Diagnosed a "sexual psychopath" he was committed to the Metropolitan State Hospital, but in June 1950 he escaped with another patient, a 23-year-old "defective" whom he married shortly thereafter. For the next two years they resided uneventfully out of state. Petitioner claimed that his discovery that his wife was sterile frustrated his intense desire to have children, and that that frustration led to his commission of the instant offense.

[7]Petitioner performed reliably in several prison jobs, worked to improve his literacy, and participated in group therapy, Bible study, and Alcoholics Anonymous. He has committed no sexual offenses in prison and has worked in close proximity to female nurses without incident. He has been charged with only a dozen rules infractions, most of them inconsequential, in the 22 years he has been imprisoned. For the first 10 years of his imprisonment his attitude was positive and cooperative. Annual evaluations at the time of parole hearings indicate, however, that by the early 1960's he concluded that he had paid his debt to society and began to express resentment at his continued incarceration. By 1970 a parole evaluation noted that he had become demoralized and would not benefit from additional imprisonment. Although respondent points to the statement of an Authority hearing panel in 1965, "that petitioner had failed to cooperate in rehabilitation programs" as partial justification for denial of parole in that year, the psychiatric evaluation for the same year which was the source of that information also recited that: "This inmate appears to have reached maximum benefit from participation in the program of this institution. . . ."

[8]Among the codes in addition to the Penal Code providing such penalties are: Food and Agricultural, Business and Professions, Corporations, Elections, Government, Health and Safety, Insurance, Labor, Military and Veterans, Public Resources, Public Utilities, Revenue and Taxation, Vehicle, and Welfare and Institutions.

legislative, not judicial, attention. And we are not called upon here to re-examine our past holdings that the Indeterminate Sentence Law is constitutional. (*In re Lee* (1918) 177 Cal. 690 [171 P. 958].) Rather, we consider only the question of whether a single punishment provision within the Indeterminate Sentence Law scheme is constitutional (*In re Lynch* (1972) 8 Cal.3d 410, 414-415 [105 Cal.Rptr. 217, 503 P.2d 921]), and, if so, whether in its administration of that provision the Authority has imposed constitutionally disproportionate punishment. (Cf. *People* v. *Wingo* (1975) *ante,* p. 169 [121 Cal.Rptr. 97, 534 P.2d 1001].)

*The Indeterminate Sentence Law*

As now constituted the administrative provisions of the Indeterminate Sentence Law provide that: "Every person convicted of a public offense, for which imprisonment in any reformatory or state prison is now prescribed by law shall, unless such convicted person be placed on probation, a new trial granted, or the imposing of sentence suspended, be sentenced to be imprisoned in a state prison, but the court in imposing the sentence shall not fix the term or duration of the period of imprisonment." (§ 1168.) Responsibility for determining the actual length of time within the statutory maxima and minima (§ 3023)[9] the convicted person is to serve in prison and/or on parole is vested in the Adult Authority (§ 5075)[10] which "may determine and redetermine, after the actual commencement of imprisonment, what length of time, if any, such person shall be imprisoned" (§ 3020),[11] and which has "the power to allow prisoners imprisoned in the state prisons to go upon parole outside the prison walls and inclosures." (§ 3040.)

---

[9]Section 3023: "The term of imprisonment shall not exceed the maximum or be less than the minimum term of imprisonment provided by law for the public offense of which such person was convicted."

[10]Section 5075: "The Adult Authority shall be composed of nine members, each of whom shall be appointed by the Governor, with the advice and consent of the Senate, for a term of four years and until the appointment and qualification of his successor. Members shall be eligible for reappointment. . . . [¶] Persons appointed to the Adult Authority shall have a broad background in and ability for appraisal of law offenders and the circumstances of the offense for which convicted. Insofar as practicable members shall be selected who have a varied and sympathetic interest in corrections work including persons widely experienced in fields of corrections, sociology, law, law enforcement, and education. . . ."

[11]Section 3020: "In the case of all persons heretofore or hereafter sentenced under the provisions of Section 1168 of this code, the Adult Authority may determine and redetermine, after the actual commencement of imprisonment, what length of time, if any, such person shall be imprisoned, unless the sentence be sooner terminated by commutation or pardon by the Governor of the State."

Although the Indeterminate Sentence Law expressly permits the Authority to determine the matter of parole "at any time after the actual commencement of . . . imprisonment" (§ 3041), it is silent, with few exceptions,[12] as to the responsibility of the Authority to fix terms and does not expressly require that a term ever be fixed at less than maximum. A practice has evolved, however, in which customarily a term is fixed only in conjunction with a grant of parole. (Adult Authority Res. No. 275 (rev. Mar. 26, 1973) and Res. No. 184 (rev. Dec. 11, 1974); 2 Cal. Criminal Law Practice (Cont. Ed. Bar 1969) p. 567.) Thus a prisoner appears before a panel of the Authority for term-fixing only when his application for parole is considered, and as a general rule if he is denied parole no further consideration is given to the determination of his term.

When the Authority does grant a tentative parole date, the prisoner's term is fixed with the number of years to be served in prison and the number to be served on parole, if he is not sooner discharged,[13] designated. The Authority may, however, redetermine the term, and in the past it has routinely refixed terms at maximum upon suspension or revocation of parole (Adult Authority Res. No. 171 adopted Mar. 6, 1951), and has also done so when a parole date is rescinded. (See, e.g., *In re Prewitt* (1972) 8 Cal.3d 470, 472 [105 Cal.Rptr. 318, 503 P.2d 1326].) The term remains fixed at maximum until a new parole date is granted.

Records of the Department of Corrections and the Authority establish that petitioner is a prisoner for whom a term has never been fixed at less than maximum, apparently because he has not been deemed ready for parole. He differs, however, from most prisoners in that category because his lack of "parole readiness" is not based on misconduct in prison, but because the Authority cannot predict his future behavior, and because he is believed to lack ability to care for himself and to conform to parole requirements except in a structured living situation with supervision.

### Constitutionality of the Life Maximum Term for Violation of Section 288.

Petitioner contends that a life term is disproportionate to the conduct proscribed by section 288, and therefore constitutes cruel and/or unusual punishment violative of the Eighth Amendment and article I, section 17.

---

[12]See, e.g., sections 3021, 3024.5.

[13]Even if a longer term has been fixed, the Authority may discharge any prisoner except those serving life terms, after he has been continuously on parole for two years based on the "standard of his rehabilitation." (§ 2943.)

Suggesting that we apply the criteria developed in *In re Lynch, supra,* 8 Cal.3d 410, and *In re Foss* (1974) 10 Cal.3d 910 [112 Cal.Rptr. 649, 519 P.2d 1073], he argues that the life maximum term is vulnerable when subjected to the three part analysis of *Lynch.* Thus, he urges us to hold the term excessive because it is (1) greater than the punishment imposed in this state for offenses which may be deemed more serious, (2) is greater than the punishment imposed in other jurisdictions for the same offense, and (3) because *in his case* the nature of the offense and of the offender do not warrant imposition of a life maximum term. It is in this last claim that the challenge to the penalty provision of the statute on its face fails, for section 288, unlike section 314 which we considered in *Lynch,* does not proscribe only a single mode of behavior which under no circumstances could justify a potential life term. To the contrary, section 288 encompasses a wide range of culpable behavior and a correspondingly wide range of punishment.

We recognized in *Foss* that the existence of gradations of culpability was an important factor in assessing the constitutionality of a punishment provision. "Relevant to this inquiry are the facts of the crime in question, the nonviolent nature of the offense, and whether there are rational gradations of culpability that can be made on the basis of the injury to the victim or to society in general." (*In re Foss, supra,* 10 Cal.3d 910, 919.) Finding that there were such gradations of culpability among persons subject to the recidivist provisions of Health and Safety Code section 11501 (now § 11352), and that the absolute denial of parole eligibility to such persons for 10 years precluded recognition of those gradations of culpability, we held the parole ineligibility provision unconstitutional.

Section 288 does not suffer from the infirmities of the statutes considered in *Lynch* and *Foss.* Like the statute examined in *People* v. *Wingo, supra, ante,* page 169, the offense described in section 288 encompasses conduct for which life might be a permissible punishment in some cases but excessive in others. Indeed, the section expressly provides that it includes "any of the acts constituting other crimes provided for in part one of this code" when performed on a child under 14 for the purpose of arousing or gratifying sexual desires. Part one of the Penal Code encompasses the great majority of all violent crimes that may be committed against the person, including such serious and aggravated offenses as murder (§ 187), mayhem (§ 203), aggravated assaults and attempts to kill and commit other felonies (§§ 216, 220, 245), and other sexually motivated assaults (§§ 261, 264.1, 286.1, 288b).

Although petitioner's characteristics at the time and the circumstances of the offense he committed were, indisputably, nonaggravated,[14] in other circumstances grave injury and even death are sometimes inflicted on victims of this offense. (See, e.g., *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256].) We therefore conclude that the question of the constitutionality of the penalty provision of section 288 is controlled not by *In re Lynch, supra,* 8 Cal.3d 410, but by *People* v. *Wingo, supra, ante,* page 169. ■ The statute encompasses offenses reflecting a wide range of culpability, including situations in which the life maximum may be a constitutionally permissible punishment, but unlike the statute considered in *Foss,* section 288 contains no limitation on the power of the Authority to give recognition to those gradations of culpability by fixing a term that is proportionate to the individual offender's culpability. Section 288 is not, therefore, unconstitutional on its face.

■ This court has an obligation, however, to look beyond the facial validity of a statute that is subject to possible unconstitutional administration since a "law though 'fair on its face and impartial in appearance' may be open to serious abuses in administration and courts may be imposed upon if the substantial rights of the persons charged are not adequately safeguarded at every stage of the proceedings." (*Minnesota* v. *Probate Court* (1940) 309 U.S. 270, 277 [84 L.Ed. 744, 751, 60 S.Ct. 523, 126 A.L.R. 530].) ■ We have recognized that this court's obligation to oversee the execution of the penal laws of California extends not only to judicial proceedings, but also to the administration of the Indeterminate Sentence Law. By way of recent example, we have applied the due process procedures set forth in *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593], and *Gagnon* v. *Scarpelli* (1973) 411 U.S.

---

[14]Respondent, drawing on material in the cumulative case summary in petitioner's central file as the source of its assertion, initially claimed that petitioner wore a "Chinese finger stall" on one of his fingers during the act. At oral argument respondent conceded that the transcript of the preliminary hearing established that the victim testified that the device, a child's toy, was placed on her fingers. It is hoped that inaccuracies in inmate records such as this and others noted by petitioner will be more easily corrected and will have less adverse impact on future parole-granting and term-fixing decisions of the Authority now that inmates may inspect such records (*In re Olson* (1974) 37 Cal.App.3d 783 [112 Cal.Rptr. 579]) and are to be given a written statement of the reason for denial of parole (*In re Sturm* (1974) 11 Cal.3d 258 [113 Cal.Rptr. 361, 521 P.2d 97]). This purpose may be furthered by the recent order of the Director of Corrections, revising the Cumulative Case Summary Manual, CS-VIII-00, to add a requirement that a copy of his cumulative case summary be given to each inmate upon its completion at the reception centers. (CS/46 (Jan. 31, 1975); see also, Inmate Records Manual IR-I-08, C4.1 and C4.2.) Existing cumulative case summaries are to be screened and after removal of confidential material, will be available for review by the inmate and his counsel.

778 [36 L.Ed.2d 665, 93 S.Ct. 1756], to both parole revocation and parole rescission proceedings under the Indeterminate Sentence Law (*Gee* v. *Brown* (1975) *ante,* p. 142 [120 Cal.Rptr. 876, 534 P.2d 716]; *In re Prewitt, supra,* 8 Cal.3d 470) and have extended these protections to Authority actions refixing terms upward. (*In re Winn,* 13 Cal.3d 694 [119 Cal.Rptr. 496, 532 P.2d 144].) We have also affirmed a prisoner's or parolee's right to prehearing disclosure of evidence to be considered by the Authority at revocation or rescission hearings. (*In re Prewitt, supra,* 8 Cal.3d 470; *In re Love* (1974) 11 Cal.3d 179 [113 Cal.Rptr. 89, 520 P.2d 713]. See also, *In re Olson, supra,* 37 Cal.App.3d 783.) And we have directed that a prisoner be given a written statement of the reason for denial of parole. (*In re Sturm, supra,* 11 Cal.3d 258.)

■ The obligation of the court to assure that the Indeterminate Sentence Law is properly administered, however, is not limited to considerations of procedural due process alone. In *In re Minnis* (1972) 7 Cal.3d 639 [102 Cal.Rptr. 749, 498 P.2d 997], we disapproved, as arbitrary and contrary to the philosophy and purpose of the Indeterminate Sentence Law, an Authority practice by which some offenders, based on their offense alone, were categorically denied parole or a term fixed at less than the statutory maximum. Our duty to assure that practices followed by the Authority do not permit unconstitutionally excessive punishment is surely no less compelling than our duty to assure that the legislative purpose of the law is carried out.

Therefore, we reject both the suggestion that our task is complete once we conclude that a statutory punishment is not excessive on its face, and the proposition that our responsibility does not extend to an examination of the term-fixing practices of the Authority to ascertain whether they comport with the constitutional demands of the Eighth Amendment and article I, section 17, of the California Constitution. ■ Nor can we accept the conclusion of our colleagues, stated elsewhere, that "the Indeterminate Sentence Law has operated in a constitutional fashion since its inception." (*People* v. *Wingo, supra, ante,* pp. 169, 186, concurring and dissenting opn. of Richardson, J.) Not only is that not a fact properly subject to judicial notice (Evid. Code, § 450 et seq.), but the assertion is contrary to both the facts of the instant case and those of the only other case in which we had cause to consider that question.

In *In re Lynch, supra,* 8 Cal.3d 410, we declared the life maximum term imposed upon a second conviction for violation of section 314 unconstitutionally disproportionate and ordered the petitioner discharged. We

also found that there was already "a vast disproportion between the conduct of which petitioner was convicted and the punishment he has suffered . . . ." (8 Cal.3d at p. 438.) Neither the petitioner in *Lynch,* nor, as shall be shown, the petitioner now before us ever had his term fixed at a number of years proportionate to his offense by the Authority at any time before his punishment became constitutionally excessive, thus irrefragably demonstrating the error of the asserted assumption that the Indeterminate Sentence Law has operated constitutionally with respect to term-fixing since its inception. Such assumption is particularly ironic in light of the express declaration of the Authority that in term setting its function is "to make the punishment fit the criminal rather than the crime." (Adult Authority Policy Statement No. 24, adopted Mar. 27, 1973.) Since, as we shall discuss further below, both the Eighth Amendment and article I, section 17, require that punishment be proportionate to the offense, we find it difficult to comprehend how such conclusion could be reached in the absence of any factual support[15] and in the face of respondent's own statement of a policy which disregards this constitutional command.

The experience of petitioners Lynch and Rodriguez, the cited policy statement, and the assertion of the Authority in this proceeding that it has no obligation, either statutory or constitutional, to ever fix petitioner Rodriguez' term at less than life imprisonment, leads us to the contrary conclusion. The Indeterminate Sentence Law is not now being administered in a manner which offers assurance that persons subject thereto will have their terms fixed at a number of years proportionate to their individual culpability (*People* v. *Wingo, supra, ante,* p. 169), or, that their terms will be fixed with sufficient promptness to permit any requested review of their proportionality to be accomplished before the affected individuals have been imprisoned beyond the constitutionally permitted term.

Having determined that the judicial function of assessing the constitutionality of penal statutes imposing punishment for crime (*People* v.

---

[15]We may speculate that the dearth of cases and other materials properly subject to judicial notice which might bear on whether the Authority is administering the Indeterminate Sentence Law so as to assure constitutionally proportionate terms is attributable to the unqualified statement in *In re Schoengarth* (1967) 66 Cal.2d 295, 302 [57 Cal.Rptr. 600, 425 P.2d 200], that a prisoner "has no vested right to the determination of his sentence at less than maximum . . . ." That statement, although made in another context, and without reference to or consideration of the possibility that the maximum term might be constitutionally excessive, doubtless has both discouraged prisoner petitions alleging that the time they have served constitutes cruel and unusual punishment, and encouraged summary denial of those petitions in which such claims have been made.

*Anderson* (1972) 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880]; *Furman* v. *Georgia* (1972) 408 U.S. 238, 269 [33 L.Ed.2d 346, 366-367, 92 S.Ct. 2726]) encompasses review of the administration of the Indeterminate Sentence Law, and finding ourselves unwilling to join in the assumption that the Authority is now administering the law in a constitutional manner, we turn to petitioner's claim that as applied to him the administration of the law has resulted in the imposition of cruel and unusual punishment.

*The Term-Fixing Responsibility of the Adult Authority.*

Petitioner asserts that as applied to him the life term is excessive. He also claims that the Authority has abused its discretion and subjected him to excessive punishment by failing to fix his term at less than maximum and in failing to grant him parole. Inasmuch as we have decided that there is merit in the first two interrelated claims, and that petitioner is entitled to be discharged from his term, we need not resolve the question regarding his readiness for parole.[16]

■ The rule that statutes are to be construed, if their language permits, so as to render them valid and constitutional rather than invalid and unconstitutional (*Erlich* v. *Municipal Court* (1961) 55 Cal.2d 553, 558 [11 Cal.Rptr. 758, 360 P.2d 334]; *Palermo* v. *Stockton Theaters, Inc.* (1948) 32 Cal.2d 53, 60 [195 P.2d 1]) is no less compelling when applied to a statutory scheme such as the Indeterminate Sentence Law than when applied to a single legislative act. Thus, we recognized in *People* v. *Wingo, supra, ante,* page 169, that a prisoner committed under a statute

---

[16]As grounds upon which the Authority has denied parole to petitioner respondent cites psychiatric evaluations diagnosing petitioner as a chronic schizophrenic in remission whose conduct was unpredictable and staff reports stating that petitioner had been rejected by his family and had no parole plan. Although our disposition of the petition makes unnecessary any decision as to whether denial of parole has been arbitrary, we are again (see fn. 14, *supra*) constrained to express our concern that such decisions, affecting as they do the life and liberty of thousands of prison inmates, must be based on accurate information. After a September 1971 en banc hearing *in absentia* the Authority evaluation recited that petitioner's "family rejects him." Yet a June 14, 1971, report of the pre-release officer from the Parole and Community Services Division advised that this was "misinformation" transmitted after a prior interview with the family in which a language barrier prevented the agent from understanding the family representatives. In fact, the family had available not only a home for petitioner but also employment in the family business.

We also note that if petitioner is a "chronic schizophrenic," the basis for that diagnosis is not apparent in the records which respondent has lodged as exhibits. The annual psychiatric evaluations in his file confirm that the condition has been "in remission" for the past 22 years. The conclusion of the Authority that his future conduct is "unpredictable," if based on that diagnosis, is questionable at best.

having a maximum term which may be disproportionate to his individual culpability has a right to have his term fixed at a number of years that is proportionate to his offense. ■ It follows, since the language of the Indeterminate Sentence Law does not require a contrary conclusion, and since we presume that the Legislature intended that both the penalty provisions of statutes defining felony offenses and the administrative provisions of the Indeterminate Sentence Law would be constitutional, that the Authority must fix terms within the statutory range that are not disproportionate to the culpability of the individual offender. The oft-stated rule that a prisoner has no right to a term fixed at less than maximum (*In re Schoengarth, supra,* 66 Cal.2d 295; *In re Cowen* (1946) 27 Cal.2d 637, 641 [166 P.2d 279]) is therefore subject to the overriding constitutionally compelled qualification that the maximum may not be disproportionate to the individual prisoner's offense. (*People* v. *Wingo, supra, ante,* pp. 169, 182.)

■ This basic term-fixing responsibility of the Authority is independent of the Authority's power to grant parole and of its discretionary power to later reduce the term thus fixed, which fixed, constitutionally proportionate, term we shall hereafter refer to as the "primary term." The Authority's power to grant parole and to later reduce the primary term remain unaffected. That power enables the Authority to give recognition to a prisoner's good conduct in prison, his efforts toward rehabilitation, and his readiness to lead a crime-free life in society. On the other hand, this discretionary power also permits the Authority to retain a prisoner for the full primary term if his release might pose a danger to society (*People* v. *Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]) and to revoke parole, rescind an unexecuted grant of parole and refix a reduced term at a greater number of years up to the primary term if the prisoner or parolee engages in conduct which affords cause to believe he cannot or will not conform to the conditions of parole, or would pose a danger to society if free. (§§ 3020, 3060; *In re McLain* (1960) 55 Cal.2d 78 [9 Cal.Rptr. 824, 357 P.2d 1080]. See also, *In re Prewitt, supra,* 8 Cal.3d 470.) These considerations, however, are based in large measure on occurrences subsequent to the commission of the offense.

Conversely, the primary term must reflect the circumstances existing at the time of the offense. Both the Eighth Amendment and article I, section 17, proscribe punishment which is disproportionate to the particular offense. The United States Supreme Court has suggested that various punishments may be imposed "depending upon the enormity of

the crime" (*Trop* v. *Dulles* (1958) 356 U.S. 86, 100 [2 L.Ed.2d 630, 642, 78 S.Ct. 590]), but has, for example, condemned a statute which required imposition of the same punishment on a forger for "falsifying a single item of a public account" as would be imposed on one whose forgery of a security "may cause the loss of many thousand of dollars." (*Weems* v. *United States* (1910) 217 U.S. 349, 381 [54 L.Ed. 793, 804, 30 S.Ct. 544].) And in *People* v. *Anderson, supra,* 6 Cal.3d 628, 643, we approved the interpretation of former article I, section 6, of the California Constitution, made by the Court of Appeal in *In re Finley* (1905) 1 Cal.App. 198, 202, that a penalty violates the cruel or unusual punishment clause if it is "an extraordinary penalty for a crime of ordinary gravity committed under ordinary circumstances." ■ Thus the rule that the measure of the constitutionality of punishment for crime is individual culpability is well established in the law of this state.

■ In the instant case the Adult Authority appears not to have recognized this distinction. Because it has not distinguished its responsibility to fix the primary term of prisoners subject to the Indeterminate Sentence Law from its parole-granting function, and because it has determined that petitioner is not ready for parole, it has either failed to fulfill its obligation to fix petitioner's term at a number of years proportionate to his offense, or, having impliedly fixed it at life (*People* v. *Wingo, supra, ante,* pp. 169, 183), has imposed excessive punishment on him.[17]

We reach the conclusion that the 22 years of imprisonment served by petitioner are excessive and disproportionate punishment by application of the *Lynch-Foss* analysis briefly referred to above. Since the question posed involves "proportionality" as measured by constitutional stand-

[17]If the Authority were to determine that the appropriate term for petitioner's offense was 22 years or less, but continued to imprison him solely because he was not competent to care for himself in the free society, his imprisonment would thereafter constitute punishment for status which is also constitutionally proscribed. (*Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417].) This does not mean that persons who because of mental illness or retardation are unable to care for themselves or pose an imminent threat to life or property need be discharged to the general population. Adequate nonpunitive means of caring for such persons are available through the Lanterman-Petris-Short Act. (Welf. & Inst. Code, § 5000 et seq. Cf. *In re Underwood* (1973) 9 Cal.3d 345, 350-351, fn. 8 [107 Cal.Rptr. 401, 508 P.2d 721].) Indeed, the Department of Corrections has established procedures for instituting proceedings for commitment for treatment under the Lanterman-Petris-Short Act. (See § 2960; Dept. of Corrections Inmate Classification Manual, ch. CL-VII-11. Special Classification and Transfer Procedures: Discharge of Mentally Disordered Persons.) Similarly, prisoners or parolees who commit new offenses are subject to criminal prosecution for those offenses and need not be released if convicted and sentenced to new terms therefor.

dards of cruel or unusual punishment under article I, section 17, of the California Constitution, these techniques are appropriate not only to the examination of statutes challenged on their face, but also to terms as fixed by the Authority in individual cases.[18]

The first analytical technique that we suggested in *Lynch* was an examination of the "nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*In re Lynch, supra,* 8 Cal.3d 410, 425.) Among the relevant factors noted there were the triviality of the offense, the absence of violence, the age of the offender, and the offender's past history and individual personality. The offense committed here is by no means "trivial," but the method of its

[18]It follows, of course, that the same considerations should guide the Authority in the future exercise of its responsibility to fix primary terms. For purposes of assessing the constitutional proportionality of an inmate's term, the court will deem it to have been fixed at the maximum if the Authority does not act promptly to fix the primary term of a prisoner committed to the Department of Corrections to serve an indeterminate sentence. (*People* v. *Wingo, supra, ante,* pp. 169, 183.) Since newly committed inmates undergo an initial period of observation and classification, and, the Authority has recently announced its intent to set tentative release dates and fix terms for most prisoners shortly after they are received, prompt fixing of the primary term will not add an extra administrative burden.

Prompt term-fixing will not only serve to alleviate one of the causes of anxiety now affecting inmates, but will also prevent the intrusion of irrelevant, post-conviction factors into the determination of the punishment that is proportionate to the offense of the particular inmate. Prompt term-fixing will also enable the inmate who is aggrieved by what he believes to be an unconstitutionally excessive term to seek judicial review of the action by the Authority. Since a prisoner may seek such review only once (*In re Miller* (1941) 17 Cal.2d 734 [112 P.2d 10]), this practice will relieve the courts of this state of the necessity to review annually, as we are now called upon to do so, the complaints of prisoners whose terms have not been fixed, and will thus avoid the type of imposition on the courts adverted to in *Minnesota* v. *Probate Court, supra,* 309 U.S. 270, 277 [84 L.Ed. 744, 751].

Prompt term-fixing will not only relieve the courts of the burden of reviewing repeated complaints by prisoners whose terms have not been fixed, but will also make possible the type of meaningful review of Authority actions to which prisoners are entitled. (See *In re Sturm, supra,* 11 Cal.3d 258, 270.) Were unrepresented prisoners required to take the initiative by seeking relief at such time as they believed their continued imprisonment to be constitutionally impermissible, not only might abuses such as that in the instant case, and that in *Lynch* recur, but courts would continue, as now, to receive inadequate petitions unaccompanied by necessary supporting data. Since prison inmates understandably lack perspective as to the propriety of their continued incarceration, and also lack the ability to marshal the facts and applicable law in support of their claims, it is probable that courts would be burdened by a flood of meritless petitions. Each inmate would seek relief annually when denied parole and/or term-fixing by the Authority in the hope that the court would agree that he had been imprisoned for a sufficient length of time. Once the primary term is fixed by the Authority, however, all of the relevant data regarding the particular inmate, the circumstances of his offense, and the criteria upon which the term is based will have been marshaled by the Authority, thus enabling petitioner to set out the basis or bases for his complaint, while at the same time providing the court with a record adequate to permit meaningful review.

commission involved no violence and caused no physical harm to the victim. The episode lasted only a few minutes. No weapon was involved and petitioner attempted none of the dangerous offenses sometimes associated with violations of section 288.

Nor do the particular characteristics of this offender at the time of the offense justify 22 years' imprisonment. He was only 26 years old at the time of the offense. His conduct was explained in part by his limited intelligence, his frustrations brought on by intellectual and sexual inadequacy, and his inability to cope with these problems. He has no history of criminal activity apart from problems associated with his sexual maladjustment. Thus, it appears that neither the circumstances of his offense nor his personal characteristics establish a danger to society sufficient to justify such a prolonged period of imprisonment.[19]

The second aspect of the *Lynch* analysis is a comparison of the punishment in question with sentences provided in California for "*different offenses* which, by the same test, must be deemed more serious." (8 Cal.3d at p. 426.) If petitioner had committed any of the following more serious offenses, as measured by the degree of violence and injury or threat of injury to victims, he would not only have been subject to significantly shorter maximum terms, but would have served those terms long since: assault with intent to murder (§ 217 (1-14 years)); manslaughter (§ 193 (not exceeding 15 years)); mayhem (§ 204 (not exceeding 14 years)); assault with intent to commit rape, mayhem, robbery, or sodomy (§ 220 (1-20 years)); arson (§ 447a (2-20 years)). Even wilful cruelty to a child is punishable by a term of only 1 to 10 years. (§ 273a.) This enumeration could be extended, but the sections cited are sufficient to establish that measured by this *Lynch* technique, the term already served by petitioner is disproportionate to his offense, since he would have already served the maximum term had he been convicted of any of these equally or more serious offenses.

---

[19]In 1956 the psychiatric evaluation diagnosed petitioner as a "[p]assive-aggressive personality, passive-dependent type with schizoid trends and sexual deviation," but did not suggest that he might be dangerous. Over the ensuing years, without reference to conduct to justify or explain the differing diagnoses, petitioner has annually been reported to suffer from "schizophrenic reaction, chronic undifferentiated type in partial remission," albeit "meek" and "passive." Although he has neither committed nor attempted any violent act in the 22 years he has been imprisoned, this "diagnosis" is relied upon by respondent to support a conclusion that "petitioner posed a risk for society." (See fn. 16, *supra.*) Nowhere in the reports is there support for a conclusion that at the time of the offense petitioner's character was such that when considered with the circumstances of the commission of the 1956 offense, life imprisonment was justifiable.

The third technique used in *Lynch* was to compare the penalty under attack to the penalties provided in other jurisdictions for the same offense. (8 Cal.3d at p. 427.) Petitioner's survey of the 45 states with comparable statutes, the accuracy of which is not challenged by respondent, reveals, including California, only 5 that establish even a possibility of a life term.[20] In 18 states the maximum penalty petitioner could have received is 5 years.[21] In another 14 the maximum term is 10 years.[22] Thus, in the vast majority of our sister states petitioner would have long since served the maximum term for the same offense.

Petitioner has already served a term which by any of the *Lynch* criteria is disproportionate to his offense. His continued imprisonment thus constitutes both cruel and unusual punishment within the meaning of article I, section 17, of the California Constitution. He is therefore entitled to be discharged from the term under which he is imprisoned. In view of this conclusion we need not consider his additional claim that the Authority has abused its discretion in failing to grant him parole.

The writ is granted. Respondent is directed to discharge petitioner from custody upon the finality of this opinion.

Tobriner, J., Mosk, J., and Sullivan, J., concurred.

[20]Arizona (Ariz. Rev. Stat. § 13-653); Idaho (Idaho Code § 18-6607); Illinois (Ill. Anno. Stat., tit. 38, § 11-4); Massachusetts (Mass. Gen. Laws Anno. 265-§ 13B [second offense]). The Idaho Supreme Court has found the life maximum term provided by statute in that state to be unconstitutional. (*State* v. *Evans* (1952) 73 Idaho 50 [245 P.2d 788].)

[21]Alabama (Code of Ala., tit. 14, § 326(2)); Arkansas (Ark. Stat. § 41-1129); Colorado (Colo. Rev. Stat. § 40-3-408); Hawaii (Hawaii Rev. Stat., tit. 38, § 768-3); Massachusetts (Mass. Gen. Laws Anno. 265-§13B [first offense]); Missouri (Vern. Mo. Stat. § 563.160); Nebraska (Rev. Stat. Neb. 1943 § 28-929 [first offense]); New Mexico (N.M.Stat. 1953 § 40-A-9-9); Oregon (Ore. Rev. Stat. § 163.425); Rhode Island (Gen. Laws R.I. of 1956 § 11-37-6); Utah (Utah Code Anno. § 76-5-404); Vermont (Vermont Stat. Anno., tit. 13, § 2602); Virginia (Code of Va. § 18.1-215), all have five-year maximum terms.

The following states have lesser terms for first offenders: Delaware (Del. Code Anno., tit. 11, § 761 [two years]); Iowa (Iowa Code Anno. § 725.2) [three years]); Louisiana (La. Rev. Stat. Anno. § 14:81 [two years]); New Hampshire (N.H. Rev. Stat. 1955 § 632:3 [one year]); Pennsylvania (Purdon's Pa. Stat., tit. 18, § 3126 [two years]); West Virginia (W.Va. Code § 61-8-29) [first offense—one year in county jail]); Wyoming (Wyo. Stat., tit. 14, § 7 [one year]).

[22]Alaska (Alaska Stat. § 11-15.134); Connecticut (Conn. Gen. Stat. § 53a-78); District of Columbia (D.C. Code Encyclopedia § 22-3501); Kentucky (Ky. Rev. Stat. § 435.105); Maine (Me. Rev. Stat. Anno., tit. 17, § 1951); Michigan (Mich. Comp. Laws Pen. Code § 750.336); Nebraska (Rev. Stat. Neb. 1943 § 28-929—second offense); Ohio (Page's Ohio Rev. Code § 2907.05(A)(3)); South Carolina (Code of Laws of S.C. of 1962 § 16-413.1); Texas (Tex. Code Anno. Pen. Code § 21.01 et seq.); Wisconsin (Wis. Stat. Anno. § 944.11); Mississippi (Miss. Code 1972 § 97-5-23). Minnesota (Minn. Stat. Anno. § 609.296) and New York (McKinney's Consol. Laws of N.Y. Book 39 § 130.65) have seven-year maximum terms.

**RICHARDSON, J.**—I fully concur in the judgment ordering petitioner released from confinement. The facts as set forth in the majority opinion reflect that the Adult Authority clearly abused its discretion in imprisoning petitioner for a period of 22 years without parole. I also fully concur in that portion of the majority opinion which upholds the constitutionality of Penal Code section 288, encompassing as it does a broad range of conduct for which life imprisonment might be proper under some circumstances.

I respectfully dissent, however, from both the premises assumed and the conclusions reached in that portion of the majority opinion which, while confirming the constitutionality of both the Indeterminate Sentence Law and Penal Code section 288, nonetheless mandates the Adult Authority "promptly" to fix an immutable maximum term for each prisoner now or hereafter committed to the Department of Corrections under an indeterminate sentence. While professing to defer to legislative primacy in consideration of the indeterminate sentence system and goals, and to focus, in the constitutional sense, only on a narrow punishment issue, the majority, nonetheless, in my view ignore such modest intentions. In doing so the majority, among other things, raise for the first time serious doubts as to the constitutionality of the long established term fixing practices under which the penal system of California has functioned for many years.

According to the majority such a startling and wholly novel conclusion is required because (1) in two habeas corpus proceedings, namely, *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], and in the present matter, the authority was found to have abused its discretion; (2) a policy statement was issued by the authority to the effect that in its term setting function, it makes punishment fit the criminal rather than the crime; and (3) the authority has taken a certain position in the instant case. These discoveries, both singly and in the aggregate, constitute in my view a very flimsy foundation on which to rest a constitutional conclusion of such sweeping import.

The majority argument ignores the time honored concept that unconstitutionality will not be presumed, but rather that legislative acts and administrative decisions taken pursuant thereto are presumed to be constitutional. (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204]; *In re Smith* (1949) 33 Cal.2d 797, 801 [205 P.2d 662].) It relies on two isolated examples, *In re Lynch, supra,* 8 Cal.3d 410 and the instant case, from the vast stream of administrative dispositions made

since inception of the law, from which two examples a broad conclusion of unconstitutionality is then extrapolated. I find it incongruous that the Indeterminate Sentence Law is suddenly rendered invalid because the authority has abused its discretion in failing to release Lynch and Rodriguez. Stranger still is the majority's treatment of *In re Schoengarth* (1967) 66 Cal.2d 295, 302 [57 Cal.Rptr. 600, 425 P.2d 200], a fairly recent unanimous opinion of this court. *Schoengarth* is directly in point on the issue of the authority's power to impose sentences at less than maximum and is totally contrary to the theses of the present majority which relegate *Schoengarth* to a footnote while enfolding it within a very revealing context. In the footnote the majority first surmise that *Schoengarth* has accounted for the small number of cases permitting review of the authority's term fixing practices. While conceding that such a conclusion is the purest speculation, they then add conjecture to speculation and secondly, conclude that *Schoengarth* "doubtless" has both inhibited prisoner petitions and encouraged their denial. Nothing whatever before us either in the record or otherwise supports such a broad conclusionary generalization.

My disagreement with the majority while relatively simple is, nonetheless, fundamental. Sharing as I do the majority's conclusion that both the Indeterminate Sentence Law and Penal Code section 288 are constitutional on their face, I would examine the propriety of the authority's action by measuring the application of the Indeterminate Sentence Law, as in the past, on a case by case basis, finding in the matter before us, as in *Lynch,* a clear abuse of discretion. Such an approach I suggest more nearly accords with the concern properly voiced by the majority for the *application* of laws which on their face are constitutional. The majority on the other hand conclude, for reasons above described, that the entirety of the authority's practice in its term fixing function is now, and has been, of doubtful validity. They therefore proceed on their own to fashion an administrative formula which will satisfy the constitutional demands as they view them. In doing so, they embark on a new course, armed with enthusiasm but neither compass nor chart. Such a course, in my view, is wholly unnecessary.

With all due deference I suggest the majority opinion underscores precisely the dangers and weaknesses inherent in the majority approach first enunciated in *People* v. *Wingo* (1975) *ante,* page 169 [121 Cal.Rptr. 97, 534 P.2d 1001]. In *Wingo,* the majority removed flexibility from the Indeterminate Sentence Law by requiring the authority to fix a sentence

maximum which it could not thereafter increase. *Wingo* constitutes a substantial amendment of the law. The majority, having in *Wingo* committed themselves to such a formulation, in *Rodriguez* now expand on it by invention of what they denominate a "primary term" commensurate with the offense, giving to the authority thereafter by means of its parole function, the power to *reduce* the primary term or, alternatively, to hold the prisoner for duration of the primary term, but not to exceed it, depending upon prison behavior.

No authority, of course, is cited for such a proposition which is as novel as it is interesting. Only time will tell whether the majority's new formula is well or ill conceived. As noted by Justice Clark in his dissent in *Wingo,* the Legislature both in its enactment of the Indeterminate Sentence Law and in its many subsequent amendments thereto has experimented with various formulae expanding and contracting the powers of the authority. The Legislature could have imposed on the authority a present limitation of the type required by the majority. It didn't. It may require it. It hasn't. Such a formulation whether reached, as here, piecemeal in quick installments, or in a single judicial quantum leap, is both unnecessary and unwise. It is unnecessary because, as noted in my dissent in *Wingo,* the habeas corpus remedy is fully available (*In re Sturm* (1974) 11 Cal.3d 258, 269 [113 Cal.Rptr. 361, 521 P.2d 97]) as always to measure and test the authority's discretion, as amply demonstrated in *Lynch* and the instant case. I am unpersuaded that there is a general unawareness of the availability of habeas corpus remedy for this purpose. Such availability of the remedy constitutes in my view a full answer to the majority's major premise that the present system deprives certain prisoners of their constitutional rights. It is unwise because, innovative as the majority's formulation is, it is only one of several alternatives. Nothing in the record before us suggests in any way that the Legislature is inattentive to, or oblivious of, the apparent necessity for the kind of major changes in the law worked by the majority. On the contrary, we are advised of intense legislative and administrative activity in this area.

I cling to the view that the Legislature, through its traditional investigative process—hearings, enlistment of informed views, weighing of alternatives and debate, is far better equipped than are we, to develop the kinds of procedural changes contemplated by the majority. In this process I would stay our judicial hands no matter how inviting the prospect. My conclusion that we should eschew any judicial tinkering

with the law is reached from no lack of awareness of the importance of the matter but from my conviction that the greater wisdom lies in judicial restraint.

McComb, J., and Clark, J., concurred.

Respondent's petition for a rehearing was denied July 30, 1975. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.