Filed 5/22/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CHARLES RILEY,<br><br>    on Habeas Corpus. | A137349<br><br>(Marin County<br>Super. Ct. No. SC181491A) |

Charles Riley, a life-term state prison inmate convicted of first degree murder in 1976, petitions for a writ of habeas corpus from a decision of the Board of Parole Hearings (Board) denying him parole. He contends the Board's finding of current dangerousness is unsupported by the evidence; the Board failed to consider his age as a relevant factor supporting suitability for parole; and his prison term is unconstitutionally disproportionate and excessive. We agree with petitioner's first contention and, accordingly, will grant the petition and remand for a new parole hearing.

**STATEMENT OF THE CASE**

On January 26, 1976, petitioner was convicted of the June 21, 1975 first degree murders of his then-girlfriend's parents. He was originally sentenced to death, but while his case was on appeal, the California Supreme Court declared the statutory death penalty scheme unconstitutional (*Rockwell v. Superior Court* (1976) 18 Cal.3d 420) and the Court of Appeal modified petitioner's sentence to life imprisonment on each count, to run concurrently. His minimum eligible parole was set at seven years, June 27, 1982.

At a hearing on November 28, 2011, the Board found him unsuitable for parole. Petitioner challenged the parole denial with a petition for writ of habeas corpus filed in the Marin County Superior Court on July 31, 2012. The petition was denied on September 24, 2012.

1

The present petition was filed in this court on December 18, 2012. We issued an order to show cause on May 7, 2013, and the parties subsequently filed their return and traverse.

**STATEMENT OF FACTS**

At the time of the November 2011 parole hearing at issue here, petitioner was 56 years old. He committed his crimes when he was about a month past his 20th birthday and his then-girlfriend was 16 years old.

The January 31, 2011 Comprehensive Risk Assessment prepared for the current parole review hearing described the commitment offenses as follows:

"According to the Circumstances of Offense Report dated June 8, 1977, and as reflected in the most recent (2008) psychological evaluation, Charles Riley (age 19) and his girlfriend, Marlene Olive (age 16) planned and executed the murder of Marlene's parents on June 21, 1975, in Marin County. Marlene Olive divulged to friends that her boyfriend, Charles Riley, hit her mother on the head with a hammer while she was sleeping in the sewing room of her home. She also stated that her father was shot in the back by Charles Riley. She admitted to wrapping up her parents' bodies in sheets and waiting until dark. Once it was dark, both she and Riley took the bodies to the fire pits at China Camp where the bodies were burned using wood and gasoline. During the trial, witnesses testified that Mr. Riley admitted to killing both victims. Apparently Mr. Riley and Marlene Olive were going to wait until the victims were pronounced dead, collect the insurance money, and go to Ecuador, South America."

The Court of Appeal's 1978 opinion summarized petitioner's statement to the police at the time of his arrest: "Defendant and Marlene had been planning to murder the Olives for some time in order to prevent them from keeping him and Marlene apart; on the day of the killings (June 21) Marlene telephoned urging him to get his gun; it was prearranged that Marlene would lure her father from the house allowing defendant to enter and kill Mrs. Olive with a conveniently placed hammer; and then shoot Mr. Olive upon his return to the house; defendant obtained his gun (a .22 caliber revolver) and

2

loaded it with bullets purchased for him by a friend; upon entering the sewing room, defendant bludgeoned the sleeping Mrs. Olive with the hammer (in a later confession to the jail nurse, defendant recounted his difficulty in dislodging the hammer and of the necessity to stab and suffocate Mrs. Olive because she continued to breathe); defendant then hid awaiting Mr. Olive's arrival; when Mr. Olive arrived and discovered the body of his wife, defendant shot him in the back; sometime later, the two of them tidied up the sewing room and rearranged certain furniture; later that evening, they placed the bodies (wrapped in sheets) in the Olives' automobile and drove to the firepits area where the bodies were doused with gasoline and set afire; defendant returned to the area on two occasions (later that night or early morning and again on June 23) and burned some of the unconsumed remains and other evidence; defendant stated he was 'high' on drugs when he committed the murders; defendant admitted discussing the killings with Deanna [a friend] on June 23." Petitioner also admitted cashing personal checks belonging to one of the victims several days after the killings.

As related in the court's opinion, at trial petitioner repudiated his confessions, claiming he had initially admitted his guilt in order to protect Marlene. He denied any complicity in the murder of Mrs. Olive and claimed self-defense in the killing of Mr. Olive, admitting only that he participated in the activities to conceal the crimes and dispose of the corpses and the theft and use of money taken from Mr. Olive's wallet. The court found petitioner's testimony about shooting Mr. Olive in self defense "implausible" and noted that petitioner and Marlene had "strong motives" to commit the crimes, in "Marlene's frequently expressed hatred for her parents and [petitioner's] anxiety to please her, the Olives' efforts to prevent Marlene from seeing [petitioner], and the personal monetary gain through the death of her parents (Marlene was the sole beneficiary in her parents' will), intended to finance their trip to South America."[1]

---

[1] According to an article in the Los Angeles Times, Marlene was held in the custody of the California Youth Authority until she turned 21. Over the ensuing years, she was arrested many times on forgery and drug related charges and served time in jail. In 1992, she was arrested for possession of stolen credit cards, counterfeit identification

Police reports from the investigation of the homicides include various indications of Marlene's expressions of desire to kill her parents. A letter to petitioner, found in his home, read in part, " 'Of course I hope you'll wait till I'm 17 to marry me or kill my parents.' " Another letter to petitioner found in Marlene's bedroom read, " 'If I could kill my parents, I wonder if Susan could come live with me.' " A third letter, found in Marlene's bedroom and dated January 1974, was addressed to " 'Mike,' " whom the police officer writing the report believed to be a former boyfriend of Marlene's, and read, " 'I was thinking about what you said, about that man who would take care of my Mom. I think we should talk it over, together. You and I. I'd be worried about what would happen after she died. But whatever did, wouldn't keep me away from you.' " The police reports include several statements from witnesses who heard Marlene express her desire and intention to kill her parents.[2]

A social evaluation by a correctional counselor at San Quentin Prison early in petitioner's incarceration at San Quentin described him as a "very quiet, mild mannered, shy and withdrawn type of person, who never did have a lot of close friends but always craved for close interpersonal relationships with others. Quite probably he just never got beyond the immature and overly dependent pre-adolescent stage of emotional development." Petitioner exhibited "a low image of himself" and appeared to be "an inadequate type of person who is unable to cope with the demands of living in the complex and urbane society," "socially and emotionally isolated and quite

---

and a forged check; police believed her to be one of the leaders of a ring of thieves and the main supplier of phony checks and credentials to the group.

[2] A 17-year-old boy told the officer that he had heard Marlene state on several different occasions that she would like to kill her mother and father. After a double date, Marlene's date told the witness that Marlene had "asked him to supply a bomb so that she could blow up her parents car." A girl who had been acquainted with Marlene for about one and a half years said that Marlene hated her parents, wished they were dead and often talked about killing them, saying on different occasions that she was going to poison them, blow them up in their car and push them off a cliff in their car. She did not take Marlene seriously, including on an occasion when Marlene asked her to be an alibi witness "as Marlene was thinking about killing her parents."

4

unsophisticated." He "felt inferior due to his overweight condition and big stature" and his sense of " 'not belonging' " was exacerbated by the family's move to Arkansas for 16 months when he was in grade school, after which he was not able to resume contact with " 'the old crowd' " and began to associate with younger peers. He began to smoke marijuana just before starting seventh grade and found a sense of "status" in giving or selling drugs to high school students as well as in his motorcycle. He did not date girls and had no girlfriend or sexual intercourse until he was 19 and met Marlene Olive. By his description of their relationship, he was "passive, insecure and greatly dependent upon" her and she took "the domineering, aggressive and influential role of leadership." She "sought him out for sex, not just daily but even more than once a day. He now reflects back and sees that she forced him to remain childlike, dependent upon her approval, wanting to always please her, while she could be 'the adult' and dominate his emotions and behavior. [¶] Reportedly, this 'love affair' had a very forcefully direct influence in motivating their decision and actions in committing these homicides."

The counselor noted that the "psychodynamics of the relationship of the Subject to his girlfriend/crime partner seems to be pivotal in evaluating this case," that "these homicides are not in keeping with his overall social background" and that "[h]is short-lived criminal career does not suggest an underlying and basic antisocial/criminal mind or orientation. That Subject is guilty of these murders in undeniable. Also, that Subject is an inadequate person goes without question."

In a 1997 interview conducted as part of the evaluation for a parole consideration hearing, petitioner maintained that when he arrived at the Olives' house, Marlene had already hit her mother on the head with the hammer, that he shot Mr. Olive in self-defense when Mr. Olive attacked him after finding his wife's body, believing that petitioner had killed her. Petitioner stated that after shooting Mr. Olive, he saw that Mrs. Olive was suffering and barely clinging to life, so he took a pillow and suffocated her. Petitioner insisted that the murders had not been planned for a long period of time, stating that Marlene talked to him about killing her parents, especially her mother, but

5

this was "only mentioned in passing and he felt that it would never actually take place." This report noted, along with a number of aggravating factors relating to the offense, that petitioner was "induced by [Marlene] to commit the crime of murder. It appears that his girlfriend had a great deal of influence over him."

In the 2010 interview for the current evaluation, petitioner initially did not want to discuss the crime, saying, " 'It won't make any difference. My memory is tainted. When I think about it, I think how unnecessary it was. Had I been stronger, had more backbone, the first time her hatred came up I should have gotten out. I just accept my responsibility for it—the nuances of who did what—I was there. I could have prevented this months earlier. I didn't because my relationship with my girlfriend was so important to me at that time. I had immersed myself in the marijuana subculture—don't be a snitch.' " Petitioner expressed concern that "whatever he said would sound like he was trying to blame others and not take responsibility for what he did. He reiterated that he takes full responsibility for the deaths of two people" and added, " 'I would do anything I could to undo what I did.' "

The psychologist who conducted the current assessment, Dr. Twohy, stated that petitioner's "expressed remorse for killing two people appeared to be internalized and emotional, rather than intellectualized and distant. He did not, however, expound on intrinsic exploration of his motivations, other than to indicate his peer-pressured drive to use substances and his emotional reliance on having Marlene as his girlfriend."[3] He

---

[3] Dr. Twohy observed, "While there is no clearly differentiated causal relationship between insight and behavior, it is generally accepted that insight is helpful in sincerely addressing areas of potential behavioral problems. In this respect, a lack of insight is one of the predictors of poor outcomes, increases the likelihood of non-compliance with treatment and predisposes an individual to repeat past mistakes. [¶] It should be noted that insight and remorse are abstract concepts, which do not readily lend themselves to operationalized definition or reliable quantifiable measurement. Therefore, any opinions regarding insight and self-assessment are subjective in nature, and should be interpreted with this caveat in mind."

6

"showed a good level of insight into his situation, his psychological strengths and weaknesses, and into some of the potential underlying causes for his offense."

Petitioner was raised in an intact family that was "stable and devoid of serious interfamilial conflicts," with no reported early emotional nor behavioral problems." His record indicated no juvenile delinquency or antisocial conduct. His first adult arrest was on March 26, 1975, when he and his girlfriend stole $1,114 worth of clothes from a department store, she directing him what to take. He was again arrested on May 14, 1975 for possession of a weapon and marijuana. The record does not reflect the disposition of these cases. Petitioner's next arrest, on July 1, 1975, was for the homicides.

Petitioner dropped out of high school during his senior year, with only a few units needed to graduate, then earned his high school diploma while in county jail. Prior to his incarceration, he had had several different jobs, including delivering newspapers, delivering pizza, bartending, and working in a circuit board factory. While incarcerated, he earned a Bachelor of Science degree in Business Administration from Chapman College. His prison work reports were "mostly above average to exceptional." Petitioner had completed Vocational Drafting with A+ grades, and his instructor stated he was employable in that field. He had worked in the Prison Industry Authority (PIA) shoe factory, and, through the vocational machine shop, had completed training as a milling machine operator, a tool grinder operator and a lathe operator. He married twice: At age 29, he married a woman he met through correspondence, but they divorced after a year; then at age 31, he married a woman to whom he remained married for 10 years, when she died of breast cancer.

Petitioner's records indicated he had incurred six rules violation reports (CDC [California Department of Corrections] 115s) during his 35-year incarceration, most recently in 1979.[4] He had been issued three Counseling Chronos (CDC 128As), reflecting "minor misconduct," most recently in 2003.[5]

---

[4] "Rules Violation Reports" document misconduct that "is believed to be a violation of law or is not minor in nature." (Cal. Code Regs., tit. 15, § 3312,

The risk assessment prepared for the current parole hearing related petitioner's report that his substance abuse as a teenager and young adult included marijuana, alcohol, hallucinogens, and cocaine, and that before he first used substances, he had been ostracized by his peers for not using. He believed his substance abuse began as a "surrender to peer pressure" and rebellion, especially against his father. He said his use of alcohol and drugs "probably played a role in his life offense in that he was 'not operating fully cognizant of everything[,]' although he did not "blame the substances for his offenses" and took "full responsibility" for both his substance abuse and the offenses. He stopped using all hard drugs but used marijuana while incarcerated until the mid-1980s; he had not used any mind-altering substance since the 1980s and stated he would never again do so. Petitioner had participated in 12-step programs at various times throughout his incarceration and, most recently, had been an active member of Narcotics Anonymous (NA) from 2008 on. He stated he was committed to remaining clean and sober and liked " 'having clarity of mind.' "

Petitioner has several medical conditions, including sleep apnea (for which he uses a "CPAP" machine), benign prostatic hyperplasia and gastroesophageal reflux disease, and is considered "mobility impaired," using a cane and wearing orthopedic shoes.

The 2011 Risk Assessment report summarized the conclusions of petitioner's prior evaluations for the Board:

---

subd. (a)(3).) The CDC 115s, dating from July 1977 to January 1979, were apparently for "fighting in '77, paraphernalia, telephone, contraband, behavioral expectations" and, most recently, "disobeying orders."

All further references to Regulations (Regs.) are to the California Code of Regulations, title 15 [Crime Prevention and Correction], division 2 [Board of Parole Hearings], section 2000 et seq.

[5] "Custodial Counseling Chronos" document "minor misconduct." (Regs., § 3312, subd. (a)(2).) Petitioner's chronos were for smoking inside a building (1994), unsanitary living quarters (2000), and "storing items in a prescription refill back other than prescribed medication." Petitioner believed this last incident involved him using a medication container to take coffee to work.

8

- In 1982, senior psychiatrist Sherman Butler reported that petitioner had "no mental disorder and that 'his violence potential at present appears no more than average.' " Senior psychiatrist Robert Brandmeyer agreed with Dr. Butler and also reported that petitioner appeared " 'somewhat insightful' and that he had made definite gains from the many Peer Counseling Programs in which he had participated."

- In 1985, after reevaluating petitioner, Dr. Brandmeyer again found no medical disorder and no more than an average risk of violence.

- In 1987, the psychiatric council for the "Diagnostic Unit" concluded that petitioner had "limited insight and evaded responsibility for his life crime," that testing indicated "narcissistic, antisocial, and histrionic personality traits, but no personality disorder," and that petitioner's testing was "favorable in terms of violence proneness." Petitioner was given a diagnosis of " 'Mixed Substance Abuse in Institutional Remission.' "

- In 1989, Dr. Butler reevaluated petitioner and found he was emotionally stable, he did not meet criteria for any psychiatric diagnosis, and his "violence potential outside of a controlled setting 'is estimated to be less than average.' "

- In 1990, psychologist Gary Elem agreed with earlier evaluations and recommended that petitioner " 'be given strong consideration for parole as soon as the Board of Prison Terms Panel finds it appropriate.' "

- In 1993, psychologist Ronald Hall found petitioner was "candid," openly discussed his crimes, and took full responsibility and demonstrated remorse for his crimes. Dr. Hall diagnosed "Psychoactive Substance Abuse in Full Remission" and concluded that petitioner's " 'level of dangerousness is far less than that of the average inmate and that his progress for a positive re-entry into society is a positive transition.' "

- In 1995, psychologist Erich Rueschenberg found no mental illness and stated that in the community, petitioner " 'should be able to hold on to his present

9

gains if he is able to maintain positive relationships with his family members and remain drug-free.' ”

- In 1997, psychologist L. W. Berning found petitioner had no mental illness, had maintained a “ ‘productive level of programming for many years,’ ” and he “ ‘had made important gains in his maturity.’ ” Dr. Berning concluded that petitioner’s “ ‘potential for inflicting violence on members of the community would appear to be low, given the circumstances of the crime and his insignificant criminal history.’ ”

- In 2002, psychologist Joe Livingston reported that petitioner’s scores on assessment measures indicated a “low to moderate level of risk for future violence.” He stated, “ ‘This outcome can be adjusted slightly downwards consequent to the dynamic factors which are largely protective from a risk of violence. Hence, the tests indicate a low risk of violence over the next ten years.’ ”

- In 2004, Dr. Livingston again reported a “low risk of future violence in the free community.”

- In 2008, psychologist Richard Starrett evaluated petitioner based on a review of the file, as petitioner declined to participate in an evaluation interview. Dr. Starrett reported that petitioner had no psychiatric diagnosis and “was deemed to be at low risk for future violence in the free community.”

Dr. Twohy reported that petitioner currently saw himself as a “very caring and giving person, as optimistic, and as a peacemaker,” describing his greatest personal strengths as “being able to maintain an even keel, to stay focused, to avoid jumping to conclusions, to be very forthright and honest, and to maintain his integrity,” and his greatest weakness to be “his tendency to ‘feel too much’ sometimes—that is, to be overly sentimental.” Asked what he had learned in prison, petitioner stated, “I have learned to be independent. I don’t succumb to peer pressure. Prison gave me a chance to step back and determine what I want to change. And, it gave me a chance to get an education.”

10

Petitioner's risk of violence was evaluated with two assessment guides specifically . . . used to estimate risk of future violence and one used to estimate general risk of recidivism. On the first of these, petitioner's score placed him in the "very low" range as compared to other North American male offenders, in the first percentile. The "demonstrated factors" were related to his past, including his "historical need for stimulation and proneness to boredom, shallow affect, impulsivity, and irresponsibility."

On the second measure, petitioner's score placed him in the "low" risk category. The "Historical" domain of this assessment indicated that he was 20 years old at the time of his first violence, and had a history of relationship instability and substance abuse problems; Dr. Twohy noted that, by definition, the historical data was "not amenable to significant positive change regardless of the number of years of his incarceration." In the "Clinical" or current domain, petitioner "displayed no predictive factors for recidivism." In the "Management of Future Risk" domain, Dr. Twohy stated that petitioner's plans for parole appeared feasible but needed to be backed up by current letters of support, that he might be overly optimistic about the ease of finding steady employment; that it appeared he would have support and assistance from family members and friends but would benefit from exploring other support resources; and that his participation in self-help groups in prison suggested he had the ability to seek out and participate in treatment activities in the community. Finally, on the assessment of general risk of recidivism, petitioner scored in the "low" range, at approximately the first percentile. The "endorsed" items on this measure were primarily related to historical factors including his offense, infractions while incarcerated and history of substance abuse. Dr. Twohy concluded that petitioner's overall risk for violence in the free community was "low."

This conclusion was consistent with other evaluations in the record. In 1997, correctional counselor L.J. May stated, "[c]onsidering the commitment offense, prior minimal arrest history and excellent prison adjustment, I feel that [petitioner] would pose a low to unpredictable degree of threat if released at this time. He has done an exceptional job in maintaining a positive attitude while inside a structured

11

environment. . . . In the past nineteen years, I have supervised [petitioner] as a Correctional Officer, a Program Supervisor and as a Correctional Sergeant. I feel that if there were such a thing as a 'model inmate', [petitioner] would have to be at the top of the list. His adjustment to life in CDC and his disciplinary free history speaks for itself. He maintains the same positive and courteous attitude that he has always kept." May reported that petitioner's file did not indicate he had participated in any self-help programming or attended any substance abuse programming; he noted that petitioner did not attend substance abuse groups "as it would conflict with his ongoing Church program," that he was the senior person in the Jewish Chapel and that he assisted with many fundraising projects and was involved in the 12-step program in the Jewish Chapel.

In a 2002 evaluation for a parole consideration hearing, correctional counselor J.D. Gerard stated, based on an interview and "approximately 10 to 12 years of casework and educational contact, that petitioner would pose a "very low degree of threat" if released at that time. The evaluation noted that since the last hearing, petitioner's "behavior has remained consistent, conforming and positive" and he received "exceptional and above average work grades." Gerard related that at the time of his offense, petitioner was "easily influenced and led by his crime partner and girlfriend, Marlene Olive," had "very low self-esteem" and negatively influenced by heavy drug use. Gerard stated, "He has somehow managed to maintain a positive attitude and outlook. He continues to seek self-knowledge and improvement through the Jewish Chaplain's Interfaith Twelve-Step program and process oriented Conflict Resolution group. His self-esteem and social skills are good. [Petitioner] has learned to make good choices and follow through with them. He is thoughtful, considerate and well-liked by staff and inmates."

In a 2004 evaluation, Gerard again concluded, "Considering the commitment offense, prior minimal arrest history, and excellent prison adjustment, I believe [petitioner] presents a very low degree of threat to the public if released from prison at this time. The crime occurred during a brief period of time during which [petitioner's]

12

behavior was aberrant due to heavy drug use, low self-esteem, and bad influence of social peers." The evaluation noted that petitioner had completed a nine week "Project Change Program," including "intensive substance abuse education," and that as a non-psychiatric inmate, petitioner had "very limited access to therapy/self-help programs" but did "participate in what is available to him." This evaluation noted that petitioner had completed "Computer Assisted Drafting" and was "employable in that field." Gerard felt petitioner's plans were "sound and realistic. With his high level of education, strong work ethic, good work skills, and support of family, he should be able to obtain a sufficient living."

A 2008 laudatory chrono from Rabbi L.A. Moskowitz stated that he had known petitioner for 10 years, during which time he had observed petitioner "demonstrate positive and mature interpersonal skills when communicating with his peers, community volunteers and Correctional Chaplains. His exhibited ability to follow[] directions, exercise good judgment and displayed patience is inspirational to the inmates in the Jewish congregation. [Petitioner] and I have conversed in regards to his inappropriate behavior, which led up to his commitment offense. He genuinely expresses remorse for his behavior. I believe he understands the expectations of this institution, the Board of Parole Hearings, and society in order to receive a parole/release date. [Petitioner] is commended for his efforts to continue to gain insight into his life choices that resulted in his incarceration."

In 2011, Rabbi Moskowitz wrote to the Board in support of petitioner's release, describing petitioner as "an active and upstanding member of the Jewish community at CMC East. He attends Jewish services and religious programming regularly. He models the ideals of ethical monotheism. He is polite, courteous and willing to help others. He serves as an upright example for other inmates to emulate." Rabbi Moskowitz stated that petitioner was "involved in numerous programs of education, personal growth, behavior modification and pro-social behavior," having earned his degree in Business Administration from Chapman University, completed five CALPIA (California Prison

13

Industry Authority) certificates at his workplace, regularly attended the Jewish 12-Steps programming and Jewish Committee for Personal Services/Gateways Hospital's one-on-one counseling, maintained active membership in good standing in the CMC's ILTAG (Inmate Leisure Time Activity Group) Narcotics Anonymous group, completed the Alternative to Violence Program basic and advanced workshops, and regularly contributed funds to CMC's Jewish Chapel Stewardship account and other community fundraisers. The Rabbi concurred with assessments in petitioner's file finding him to be at low risk for future violence in the free community.

With regard to plans for parole, Dr. Twohy's report related that petitioner intended to live in Santa Rosa, where he had many family members and friends and would have the most support for his transition back into the community. He planned to live with or close to his mother, had a union contact in the Bay Area who would help him find employment, and planned to continue his involvement with Narcotics Anonymous (NA) and/or Alcoholics Anonymous (AA). Commenting that "[a]lleged sobriety in a controlled environment for an extended period of time is not synonymous with continued abstinence in the free community[,]" Dr. Twohy noted that a comprehensive relapse prevention plan would be "essential to facilitate optimal success in the community."

At the hearing, the Board received a letter from the Director of Partnership for Re-Entry Program (PREP) in Los Angeles, stating that the program supported petitioner's release to live with his mother but, if the Board decided to release him to a more structured environment in Southern California, petitioner was assured a room in one of PREP's transitional homes as well as a position in the business the program sponsored, in which he would begin as a trainee and work up to a paid position. Petitioner told the Board that while he ultimately wanted to go to Northern California and his mother's home, he felt it would benefit him to have a "stopgap" between prison and home.

The Board received letters in support of petitioner's release from his mother, nieces and some 17 family and personal friends, all emphasizing the maturity and responsibility he had gained over the years in prison and support he would have from

14

family and friends if granted parole. The District Attorney's office submitted a letter of opposition, as did the San Rafael Police Department. The latter urged denial of parole because " 'this incident shattered the San Rafael community, especially because the Olives were murdered in their home. San Rafael needs to remain a safe environment for existing and future families to thrive. A release of a criminal of this magnitude would destroy confidence in the criminal justice system.' "

At the parole hearing, the Board asked petitioner about how he began using drugs and petitioner explained that he was trying to fit in with his peers: Everyone he knew and had grown up with was already smoking marijuana, he was "kind of an outcast" and, after a couple of specific triggering incidents, he decided he had to "join the crowd."[6] Petitioner explained that he had been a "very heavy kid" and "kind of picked on and bullied most of [his] life," and found acceptance with his peers by joining the drug culture. He described his drug use as causing "some really incoherent thinking": "[Y]ou become more isolated and within the . . .drug culture, and us against them kind of thinking takes place when you're involved in that [¶] . . . [¶] . . . like they don't know what you're talking about, and why is everybody picking on me kind of '60s/'70s thinking that was going on." Marlene was part of this culture and they did drugs together. Petitioner said he thought his relationship with Marlene was good at the time but "I look at it now and see that it wasn't."

The Presiding Commissioner next asked petitioner what he had done to address his drug use and petitioner replied that in addition to "quitting many years ago," in 1979 he "started looking at [his] life and things that [he] wanted to change" and began following the "12-steps program." The commissioner noted that petitioner was not involved from 2002 to 2010 and petitioner said he was involved in the 12-step program "through the Jewish program" rather than the prison one, and that this program covered "whatever

_____

[6] Petitioner referred to an evening when he kicked people out of his car for smoking marijuana and they threw rocks at him for the rest of the evening, and an incident in which his father beat him up for something he did not do (resulting in his dropping out of high school due to anger at his father).

your particular problem is be it alcohol, or drugs, or emotional dependency." From the program, petitioner learned "better ways of coping with things," that "there were people out there that I can go to and say, hey, I've got problem here, you know, and get the help that I needed." He explained that he had stopped using drugs so long before starting the 12-step program that, for him, it was not about the drugs but "about having a social connection with people who are trying to better their lives, and that's what I've been trying to do since I've come to prison. I think it's given me additional tools." Petitioner said he now had "good self-esteem" because "I'm proud of what I do. I am proud of who I am. I'm not proud of what I've done. There are things—this crime is an example. I'm not proud of that, but I live to the best of my ability. I have an outstanding life. I take pride and integrity in being a decent person, helping people when I can. And those who know me appreciate me."

As for what would "prevent [him] now from falling prey to those issues," petitioner stated that "[b]eyond an extreme self-determination that this is never going to happen again," he had learned he could trust people when he had problems, such as to help him deal with his depression when he lost his father and his wife. He joined the 12-step program "to have a social connection that was beneficial to [him]"; he had been a member of the Jewish congregation for 25 years and intended to continue that; he had strong family ties and people ready to help him if he was released.

Asked about how he became involved in the crimes, petitioner said, "It began in disbelief. I did not believe that this was something that was going to—ever going to take place. And my desire to have this relationship was so, was overwhelming to me. And so, whatever when talk of this crime came about, I went along with it, and it grew from there. I was a sick kid. I mean, the way that I look at that what I was thinking, I was willing to do this because my relationship with her was more important to me than the consideration of other people's lives." He had never had a girlfriend before and "that's what I always wanted." Asked if he would have "done anything" to keep the relationship, petitioner said, "I think ultimately that's what I did. I can look back on it now and see there's 100

16

points where I should have stopped and walked away from her and had, you know, gone to the authorities about it, to my family about it, to anybody, to her parents even. . . . At the time, I didn't feel that I could. The further along it went, the more trapped into the situation I felt and to the point where I did what I—I took, you know, their lives. And I would do anything to change that now, and not because of this moment."

Petitioner later elaborated, "I listened to her, what I thought at the time were angst with her issues with her family, and this agreeing with and going along with it. And when expressions of her desire to was primarily kill her mother, I just listened to it, yeah, I understand, but it was never something at the time that I believed would ever come to pass. And when it finally came to the point where the day of the crime took place, I felt trapped. And I can look at even that day, that moment, and realize that wasn't a trap, that I had decisions, and that it was my decision to go on and to participate in this crime." Petitioner did not think he had a problem with "females bullying [him] around" and had "long since learned how to say no," noting that his wife was a "very strong willed individual who had her opinions and, but we respected each other."

Petitioner stated that he got along well with Marlene's parents and was accepted into their home until Marlene started getting into trouble; he was banned from seeing her after the two were arrested for shoplifting. He did not hold this against her parents and was not angry with them, saying "I bore them no ill will, and that's what makes what I did all the more difficult to stomach." Petitioner felt drug use played a role in that it "certainly contributed to not thinking clearly or rationally."

Petitioner felt that substance abuse would "absolutely not" be an issue once he was out of prison: "[B]eyond the fact that I haven't done any drugs for more years than I can actually number, and I'm surrounded by people who use drugs on a daily basis and I have no desire to partake. I don't want—there is nothing, absolutely nothing going to—when the day comes that on the outside of this fence is going to put me back inside this fence. I'm going to do—I'm going out to live a moral life, a life that allows me to pay back those that stood behind me, and to try to enjoy the things that I threw away 36, 37 years

17

ago. I didn't have a realization that they were out there. I can't let them down. The people that I've met, the staff that I've known over the years, some of them who were like father figures to me, I would never let them down." Asked what he would do if he had the urge to use drugs once released, where they were easier to get than in prison, petitioner said he would talk to someone, specifically noting his relationships with his Rabbi, his friends, his mother, his nieces and the man who lived with his mother.

Petitioner felt his biggest obstacle was going to be employment; he watched the news and was aware of "what's going on out there." He hoped the machinist trade he had just completed would allow him to find employment sufficient to "sustain" himself and "look after" his mother.

At the conclusion of the hearing, petitioner addressed the Board: "I in no way want anybody to misconstrue what I've said as trying to shift blame on my co-defendant for my actions. I'm responsible and not the drugs, because it was my choice to use the drugs. They certainly contributed to making a bad decision. I'm the one that's responsible for James' and Naomi's lives. I could have done better. I should have done better. I knew better, but I did it. Now I've lived a life since that time, and I sincerely have tried to make amends and change for my actions, and what I did to the Olives in taking their lives. There is really—I can't do anything for them, and I wish above all else that's what I could do."

The Panel noted that at the conclusion of petitioner's last parole hearing in 2008, the Panel said "no more 115s, 128s, learn a trade, continue with self-help, and they need positive chronos." It was noted that petitioner had been free of disciplinary incidents, had earned a college degree, completed work in computer assisted drafting and the machine shop, worked in the PIA shoe factory, and was scheduled to begin work in the print plant. Regarding self-help, he had participated in the "CADX program" and many peer counseling programs, had been an active member of NA since 2008 and attended religious services on Saturday mornings.

18

## DISCUSSION

## I.

The Board denied parole because it found that petitioner had not sufficiently explored and addressed all the reasons for his crime and for his substance abuse at that time. Petitioner contends the decision is unsupported because it failed to identify a material deficiency in his understanding and acceptance of responsibility for the crime and/or a rational indication that any perceived deficiency in his insight makes him currently dangerous. He further contends there was no evidence of substance abuse posing a problem, and the Board failed to consider his age as a factor of suitability for parole.

" ' "Subdivision (b) of [Penal Code] section 3041 provides that a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual,' " ' and mandates that the Board 'normally' set a parole date for an eligible inmate, and must do so unless it determines [that] an inmate poses a current threat to public safety. ([*In re*] *Prather* [(2010)] 50 Cal.4th [238,] 249 [(*Prather*)], quoting *In re Lawrence* (2008) 44 Cal.4th 1181, 1202 (*Lawrence*).) As a result, parole applicants have a 'due process liberty interest in parole' and ' "an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." ' (*Lawrence*, at pp. 1191, 1204, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 (*Rosenkrantz*).)" (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 615 (*Stoneroad*).)

"We review the Board's decision under a 'highly deferential "some evidence" standard.' " (*In re Young* (2012) 204 Cal.App.4th 288, 302 [(*Young*)], quoting *In re Shaputis* (2011) 53 Cal.4th 192, 221 (*Shaputis II*).) "[T]he appellate court must uphold the decision of the Board or the Governor 'unless it is arbitrary or procedurally flawed,'

19

and it 'reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision.' ([*Shaputis II, supra,* 53 Cal.4th] at p. 221.) 'The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence.' (*Ibid.*) At the same time . . . the Board's decision must ' "reflect[] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards." ' (*Shaputis II*, at p. 210, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 677, and citing *Lawrence, supra*, 44 Cal.4th at p. 1204, and [*In re Shaputis* (2008)] 44 Cal.4th [1241,] 1260-1261 [(*Shaputis I*)].)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 616.) We are required to affirm a denial of parole "unless the Board decision does not reflect due consideration of all relevant statutory and regulatory factors or is not supported by a modicum of evidence in the record rationally indicative of current dangerousness, not mere guesswork." (*Stoneroad,* at p. 616.)

The nexus to current dangerousness is critical. "*Lawrence* and *Shaputis I* 'clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' (*Prather, supra,* 50 Cal.4th at pp. 251–252.)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 615.) " 'It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of current dangerousness to the public.' (*Lawrence, supra*, 44 Cal.4th at p. 1212, italics added.) The Board 'must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record.' (*Prather, supra*, 50 Cal.4th at p. 255, italics added.)" (*Young, supra,* 204 Cal.App.4th at p. 303.) " '[T]he

proper articulation of the standard of review is whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability. (*Lawrence, supra*, 44 Cal.4th at p. 1191.)' ([*Prather*]*, supra*, 50 Cal.4th at pp. 251-252.)" (*Shaputis II, supra,* 53 Cal.4th at p. 209.)[7]

The Board's explanation of its denial of parole reflects two reasons for its decision: That petitioner had not sufficiently explored the reasons he committed the crimes, and that he had not sufficiently addressed his substance abuse problem. Noting petitioner's explanation that he was drawn into the crime because of his relationship with Marlene, the Board felt petitioner had not explored other issues involved, including the anger it believed was reflected in the act of suffocating Mrs. Olive and the financial

---

[7] The Board's regulations set forth six circumstances tending to show unsuitability for parole and nine tending to show suitability, leaving the importance of these circumstances in a particular case to the judgment of the panel. (Cal. Code Regs., tit. 15, § 2402 [(Regs.)]) The circumstances tending to show unsuitability are (1) that the commitment offense was carried out "in an especially heinous, atrocious or cruel manner," (2) that the prisoner on previous occasions inflicted or attempted to inflict serious injury, especially if he or she "demonstrated serious assaultive behavior at an early age," (3) that "the prisoner has a history of unstable or tumultuous relationships with others," (4) that the prisoner has previously committed sadistic sexual offenses, (5) that "the prisoner has a lengthy history of severe mental problems related to the offense," and (6) that "the prisoner has engaged in serious misconduct in prison or jail." (Regs., § 2402, subd. (c).) The circumstances tending to show suitability are (1) that the prisoner does not have a juvenile record of assaults or crimes with a potential of personal harm to victims, (2) that the prisoner "has experienced reasonably stable relationships with others," (3) that the prisoner has performed acts tending to indicate remorse or indicating he "understands the nature and magnitude of the offense," (4) that the prisoner committed the crime as a result of significant stress in his life, particularly stress built over a long period of time, (5) that the prisoner suffered from battered women's syndrome, (6) that the prisoner "lacks any significant history of violent crime," (7) that the prisoner's "present age reduces the probability of recidivism," (8) that the prisoner has made realistic plans for release or developed marketable skills that can be put to use upon release, and (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., §2402, subd. (d).)

motive of obtaining the insurance money.[8]  Regarding petitioner's drug use at the time of the crimes, the Presiding Commissioner noted that petitioner's relapse plan indicated he reacted to "stress and anger and depression," and commented, "Very impersonal because everybody gets those.  Everybody gets stress and anger and depression.  That's part of being a human being, but we have to identify the signs and symptoms of that.  What makes us depressed?  What makes us angry?  Is it relationships?  Is it being in certain types of relationships that makes us depressed?  Is it money that we go to the next level of our behavior?  Issues in and of itself are useless unless they are attached to human emotions, and you have to have understanding of that prior to this Board feeling confident that you, when exposed to the same patterns, you don't revert to the easiest way out or to continue criminal activities."  Although he believed petitioner's intention to refrain from drug use to be heartfelt, the commissioner continued, "I've sat on many, many panels that they come back to me because their intentions were good.  Although stresses in their life, although they didn't understand triggers in their life, they didn't understand what was out there and how hard it was that they began to use drugs again.  They began to attach themselves to the criminal element.  You have to understand that we are all subject to negative behaviors, if we're not aware of them, and if we're not aware of the impact that they possibly can make.  There is no such thing as my desire will

---

[8] The Presiding Commissioner emphasized that the killings were "execution-style" and "[p]lanned, calculated, and carried out."  Noting petitioner's statement that he was in "disbelief," the commissioner stated, "but this Panel finds that after two months disbelief could be resonating for that period of time. You also stated that it was a situation you were drawn into because of the relationship, of your desire to maintain a relationship. The killing was execution-style murder with a hammer and there was indication of suffocation, which is an indication of anger.  There was the indication of insurance money, which is an indication of money being a motive.  There was lot more issues at stake than what you said, and I think you would have to explore these issues of money, sex, of anger, of relationships. . . . This Panel will want to hear next time how you address all those issues, because it's a material deficiency of the dynamics of this case that you have failed to take heart and address."

override the facts and will override conditions, because the conditions will prevail, and it's very important that you have to understand that."

As the Supreme Court made clear in *Shaputis II, supra,* 53 Cal.4th 192, "[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term 'insight,' but they direct the Board to consider the inmate's 'past and present attitude toward the crime' (Regs., § 2402, subd. (b)) and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense.' (Regs., § 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of 'insight.' " (*Shaputis II*, at p. 218.) "[T]he presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. (*Lawrence*, [*supra*, 44 Cal.4th] at p. 1227; see also *Shaputis I*, [*supra*, 44 Cal.4th] at p. 1261, fn. 20.)" (*Shaputis II, supra,* 53 Cal.4th at p. 218.)

Petitioner described to the Board exactly why he believed he committed the crimes: He was a "sick kid," so in thrall to his relationship with the first girlfriend he had ever had that he felt unable to walk away from what she wanted him to do. The psychologist's report described petitioner's expressed remorse for the killings as "internalized and emotional, rather than intellectualized and distant," but went on to state that petitioner did not "expound on intrinsic exploration of his motivations, other than to indicate his peer-pressured drive to use substances and his emotional reliance on having Marlene as his girlfriend." Although noting that lack of insight "is one of the predictors of poor outcomes," the psychologist also cautioned that "insight and remorse are abstract concepts, which do not readily lend themselves to operationalized definition or reliable quantifiable measurement" and therefore "any opinions regarding insight and self-assessment are subjective in nature, and should be interpreted with this caveat in mind."

The Board clearly did not accept that petitioner's explanation of his motivation for committing the offenses was sufficient, pointing to other factors, such as anger and

23

money, as additional motivations. Accepting that such additional factors are supported in the record—as indicated in the Court of Appeal's description of the crime—the critical question is whether there is some evidence in the record to support the conclusion that whatever deficiency may exist in petitioner's understanding of the forces that led him to commit the murders demonstrates that petitioner currently poses a threat to public safety. The commissioner's stated concern that absent better understanding the Board could not be confident petitioner would not revert to criminal activities "when exposed to the same patterns" ignores the unique set of circumstances in which petitioner committed his crimes.

In *Shaputis II*, the Board denied parole based on the commitment offense (the murder of the defendant's wife), a long history of domestic abuse leading up to the offense, and the defendant's failure to accept responsibility or gain insight into the reasons for the abuse and murder. (*Shaputis II*, *supra*, 53 Cal.4th at p. 207.) The defendant maintained that the shooting occurred as an accident despite this explanation being irreconcilable with evidence at the scene, and in a statement to the Board discussed his "alcoholism, his 'low morality,' his deep regret, and his determination not to 'again engage in such terrible conduct.'" (*Id.* at pp. 213-214.) The defendant had previously been convicted of molesting one of his daughters, a plea on charges reduced from her claim of rape; the defendant had initially minimized and then denied the offense. (*Id.* at pp. 203-204.) The *Shaputis II* Court explained that "the Board was left with no indication that petitioner understood why he shot his wife, what he had done in the incidents of molestation, or how his behavior affected his other daughters. A general recognition of moral deficiency and alcohol abuse is insufficient to explain an entrenched pattern of domestic abuse, child molestation, and a pointblank shooting." (*Id.* at pp. 213-214.)

The present case is quite different. Petitioner's offenses were horrific. But they were a one-time occurrence, neither preceded nor followed by any evidence of petitioner having a violent nature. As petitioner explained, when he committed the crimes, he was a 20-year-old high school drop out and self-described "sick kid," overweight and suffering

24

from low self-esteem and years of being a social outcast, who had been accepted into a peer group based on substance abuse, become involved in the first sexual relationship of his life with a girlfriend who made no secret of wanting her parents dead, and would have done—and in fact did—"anything" to keep that relationship. At the time of the 2011 parole hearing, petitioner was a 56-year-old man who had not used illegal drugs or alcohol for over 30 years; had earned a college degree, training in various trades and consistently received positive work reports; became a respected and devoted long-time member of his religious community; had been married twice; and suffered from several physical disabilities. [9] The only negatives in his risk assessments were due to the historical factors of his offenses and state at the time he committed them, and his history of substance abuse. The psychologist noted that the historical factors were immutable. Egregious as petitioner's offenses were, "the commitment offense is only relevant if [petitioner's] current mental attitude establishes that despite his excellent and long-standing intervening conduct, he would still pose an unwarranted risk to public safety if released." (*In re Denham* (2012) 211 Cal.App.4th 702, 715.) The record before us reflects no evidence that this is the case.

The history of substance abuse was of concern to the Board because of the potential for the availability of substances and increased pressures of life outside prison to trigger a relapse. But given petitioner's extremely long period of abstinence, and determination to continue with NA and seek help from his network of support in the

---

[9] As petitioner's attorney argued to the Board: "[H]e knows what the motivation was. I was a fat kid, and I wanted people to like me. That's who he was, and he would do anything, as the district attorney noted, he did the worst thing that you could do and he did it twice to keep that person that liked him. That was when he was 20 years old. As you know from the rules and regs 2402, whatever it is, and age is one of those factors that shows that he is suitable. He's not a 20-year-old kid anymore. He's a 56-year-old man who has done everything that he needs to do. He's lived the life of suitability. . . . He did everything the Board asked him to do last time. . . There is nothing here to link him [to] that kid that committed that horrible crime back in 1975."

event he was drawn to consider using drugs or alcohol, it is difficult to imagine what more he could have done to address this concern. As we have previously noted, " '[t]he risk a former drug or alcohol abuser will relapse, which can never be entirely eliminated, cannot of itself warrant the denial of parole, because if it did the mere fact [the] inmate was a former substance abuser would "eternally provide adequate support for a decision that [he] is unsuitable for parole." ' (*Stoneroad, supra,* 215 Cal.App.4th at p. 625, quoting *In re Morganti* (2012) 204 Cal.App.4th 904, 921.) " '[T]he risk an inmate may fall back into alcohol or drug abuse can justify denial of parole only where it is greater than that to which a former drug or alcohol abuser is normally exposed.' " (*Ibid.*) Here, nothing in the record remotely suggests petitioner is likely to return to the use of alcohol or illegal substances he left behind more than 30 years ago. Of primary importance, again, the circumstances of petitioner's life crime were so unique that it is difficult to see any nexus between his 30-year-old substance abuse as a teenager and young adult and current dangerousness to the public.

The assessment of petitioner's risk of future violence prepared for the current hearing found a strikingly low level of risk, and emphasized that such indicators of risk as existed were based on historical, not current, factors. The assessment found petitioner's potential for violence in the free community to be higher than less than one percent of North American male offenders on one instrument, with the only "demonstrated factors" being ones related to his past; on the other measure of potential for violence, petitioner was found to be in the low risk category based on historical factors, and to have *no* predictive factors for recidivism in the current domain. On the general measure of potential for recidivism, petitioner's risk was found to be higher than less than one percent of male offenders in the United States, again, with the "endorsed items" primarily related to historical factors. Earlier assessments documented in the record are consistent with the current one: The earliest, from 1982 and 1985, found petitioner to have "no more than average" potential for violence, and all the assessments from 1989 on found his risk of violence to be "less than average" or "low."

26

Petitioner's low risk for future violence is consistent with data on recidivism of life prisoners in general. The Board made no reference at all to petitioner's age as a factor indicating suitability for parole. (Regs., § 2402, subd. (d)(7).) But as we noted in *Stoneroad, supra,* 215 Cal.App.4th at page 634, "the recidivism rate of lifers is dramatically lower than that of all other state prisoners, indeed infinitesimal. (Weisberg et al., Stanford Criminal Justice Center, Life in Limbo: An Examination of Parole Release for Prisoners Serving Life Sentences With the Possibility of Parole in California (Sept. 2011) 1, 17 (Stanford Study).)"[10]

Considering the assessments of the Board's experts and petitioner's conduct over more than 35 years of incarceration, and the absence of any articulation by the Board of a nexus between the reasons it stated for and its conclusion of unsuitability, we fail to see "some evidence" of current dangerousness in either petitioner's understanding of his reasons for committing his offenses or his substance abuse at that time.

The Board did not suggest that its denial was based upon any other circumstances tending to make petitioner unsuitable for parole. The Board emphasized the egregious circumstances of the offense—a circumstance pointing to unsuitability under Regulation 2402, subdivision (c)(1)—but this in itself in an insufficient basis for denying parole. "[A]lthough the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the

---

[10] "This study observes that 'among the 860 murderers paroled by the Board since 1995, only five individuals have returned to jail or returned to the California Department of Corrections and Rehabilitation[] for new felonies since being released, and none of them recidivated for life-term crimes. This figure represents a lower than one percent recidivism rate, as compared to the state's overall inmate population recommitment rate to state prison for new crimes of 48.7 percent.' (Stanford Study, *supra*, at p. 17, fn. omitted.) The study also notes that other studies 'demonstrate that as a general matter, people age out of crime. For most offenses—and in most societies—crime rates rise in the early teenage years, peak during the mid-to-late teens, and subsequently decline dramatically. Not only are most violent crimes committed by persons under 30, but even the criminality that continues after that declines drastically after age 40 and even more so after age 50.' (*Ibid*.)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 634, fn. 21.)

27

public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Lawrence, supra,* 44 Cal.4th at p. 1214.) We are not aware of any evidence in the record indicating the applicability of any of the other circumstances tending to show unsuitability enumerated in the Regulations. (Regs., § 2402, subd. (c).) On the other hand, the record does reflect evidence of many of the circumstances tending to show suitability, notably the absence of a prior history of assaultive or violent conduct (Regs., § 2402, subds. (d)(1)), (d)(6)); petitioner's efforts throughout his incarceration to "make amends" by altering the pattern of his life and interpersonal relationships, as documented by his Rabbi and various prison reports (Regs., § 2402, subd. (d)(3)); his advancing age (Regs., § 2402, subd. (d)(7)); his realistic plans for release and development of marketable skills (Regs., § 2402, subd. (d)(8); and his many positive institutional activities (Regs., §2402, subd. (d)(9)). Several of these positive circumstances were noted by the Board, and, as we have said, it is not for us to question the weight the Board attached to the factors it considered. (*Stoneroad, supra,* 215 Cal.App.4th at p. 624.) Our point is simply to underscore the limited basis of the Board's decision, which rested solely upon circumstances that, if supported by the evidence at all, were not linked by any reasonable theory to a determination of current dangerousness.

## II.

Petitioner contends his prison term is disproportionate and excessive in violation of the California and United States Constitutions. He maintains that because he was sentenced under the former Indeterminate Sentencing Law (ISL), which emphasized rehabilitation as the primary consideration regarding parole, the Board's use of the Determinate Sentencing Law (DSL), emphasizing punishment, violated his right to due process and ex post facto principles. Petitioner maintains that he is currently serving a

28

disproportionate term based entirely upon punishment in disregard of his rehabilitation, as evidenced by the fact that he has already been incarcerated longer than the base term specified in the Board's regulations as the proportionate term for his offense. As we will explain, petitioner has not made a showing that entitles him to relief on these grounds. Due to changes in the Board's procedures required by a recent judicial settlement, his base term and adjusted base term will be set at his new parole hearing, which will facilitate review of any subsequent claim that his term is constitutionally disproportionate.

## A.

Under the ISL, "[t]he court imposed a statutory sentence expressed as a range between a minimum and maximum period of confinement—often life imprisonment—the offender must serve. An inmate's actual period of incarceration within this range was under the exclusive control of the parole authority, which focused, primarily, not on the appropriate punishment for the original offense, but on the offender's progress toward rehabilitation. During most of this period, parole dates were not set, and prisoners had no idea when their confinement would end, until the moment the parole authority decided they were ready for release. (See *People v. Jefferson* (1999) 21 Cal.4th 86, 94–95 (*Jefferson*); Cassou & Taugher, *Determinate Sentencing in California: The New Numbers Game* (1978) 9 Pacific L.J. 5, 6–16 (Cassou & Taugher).)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1077 (*Dannenberg*).)

The DSL, by contrast, "implemented the Legislature's finding that 'the purpose of imprisonment for crime is punishment,' a goal 'best served by terms proportionate to the seriousness of the offense,' with provision for sentence 'uniform[ity]' for similar offenses. ([Pen. Code,] § 1170, subd. (a)(1).)" (*Dannenberg, supra,* 34 Cal.4th at p. 1078.) For most felonies, the DSL establishes a triad of alternative sentences, and the sentencing court imposes the middle term unless mitigating or aggravating circumstances call for imposition of the lower or upper term. The sentence is thus tailored mainly to the offense, not the offender, unlike under the ISL, which tailored the sentence to the

offender rather than the offense. Under the DSL, however, "certain serious offenders, including 'noncapital' murderers (i.e., those murderers not punishable by death or life without parole), remain subject to indeterminate sentences. These indeterminate sentencees may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement. (See *Jefferson, supra,* 21 Cal.4th 86, 92-92.) As under prior law, life inmates' actual confinement periods within the statutory range are decided by an executive parole agency," now the Board. (*Dannenberg, supra,* 34 Cal.4th at p. 1078.)

Under both the ISL and the DSL, a life prisoner must be found suitable for parole before a parole date is set. (*In re Stanworth* (1982) 33 Cal.3d 176, 183 (*Stanworth*); Pen. Code, § 3041.) With respect to parole *suitability*, application of DSL guidelines to a prisoner convicted and sentenced under the ISL has been upheld against challenge on ex post facto grounds. (*In re Seabock* (1983) 140 Cal.App.3d 29, 40 (*Seabock*); *In re Duarte* (1983) 143 Cal.App.3d 943 (*Duarte*).) The ex post facto doctrine is " 'aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." [Citations.]' (*California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 504 (*Morales*).)" (*In re Vicks* (2013) 56 Cal.4th 274, 287.) *Seabock* compared the procedures for determining parole suitability under the ISL and DSL,[11] and concluded

---

[11] Under the ISL, no formal criteria guided the decision; the parole agency "was vested with a broad discretion to grant or deny parole" and in doing so the agency considered the gravity of the offense along with "all of the factors relevant to a particular prisoner on an individual basis." (*Seabock, supra,* 140 Cal.App.3d at pp. 35-36.) In the DSL, the Legislature directed the Board to "set a release date 'unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ." (*Seabock*, at p. 38, quoting Pen. Code, § 3041, subd. (b).) The Board was further directed to " 'establish criteria for the setting of parole release dates' and was told that in doing so it 'shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime.' " (*Seabock*, at p. 38, quoting Pen. Code, § 3041, subd. (a).) As described above (fn. 8), the Board's regulations set

30

that the DSL "continues to demand what the case law required under the ISL: a weighing process, an exercise of discretion based upon all of the relevant factors." (*Seabock*, at p. 38.) *Seabock* found no ex post facto violation because the DSL guidelines did not "decrease [the inmate's] parole eligibility or chance therefor" but only "spell[ed] out what was always the fact and the law: the parole-setting agency is empowered to deny parole only after due consideration of all relevant factors including but not limited to the gravity and circumstances of the crimes involved." (*Id.* at p. 40.)[12] *Duarte, supra,* 143 Cal.App.3d 943, 947-950, added that while the Board's regulations concerning parole *release dates* under the DSL "reflected a change in penal philosophy through a generalized increase in terms of imprisonment, focusing on a prisoner's crimes, rather than his progress toward rehabilitation, . . . [a]s to the parole *suitability provisions*, there has been neither a change in philosophy, nor a change in the criteria used to reach a decision." (*Duarte*, at p. 950 [italics added]; see also *Connor v. Estelle* (9th Cir. 1992) 981 F.2d 1032, 1033.)

As both *Seabock* and *Duarte* recognized, with respect to the determination of an inmate's *release date*, in the change from the ISL to the DSL, "the standard of punishment has been altered to [the inmate's] prejudice in violation of ex post facto principles." (*Stanworth, supra,* 33 Cal.3d at p. 188; see *Seabock, supra,* 140 Cal.App.3d

---

forth specific factors bearing on suitability or unsuitability for parole for the Board to consider. (Regs., § 2402.)

[12] *Seabock* applied the then-governing ex post facto test, which stated, " 'two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, [fn. omitted] and it must disadvantage the offender affected by it. [Fn. omitted; citations.]' " (*Seabock, supra,* 140 Cal.App.3d at p. 32, quoting *Weaver v. Graham* (1981) 450 U.S. 24, 29.) *Morales,* quoted in the text, disavowed *Weaver*'s "disadvantaged" language, stating that "the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." (*Morales, supra*, 514 U.S. at p. 506, fn. 3.) This change does not alter *Seabock*'s conclusion.

at pp. 40-41, *Duarte, supra,* 143 Cal.App.3d at pp. 946, 951.)[13]  Accordingly, *Stanworth* held that an inmate sentenced under the ISL "is entitled to parole release consideration under both ISL and DSL standards" and "to a hearing and to the benefit of the earlier release date, if any, set pursuant to both standards." (*Stanworth*, at p. 188.)  The Board's regulations so provide.  (Regs., § 2300.)

At this stage of the proceedings, however, where the question is petitioner's suitability for parole, the Board's utilization of DSL guidelines did not result in a violation of ex post facto principles.  Petitioner's articulation of his due process claim— "the failure of the Board to apply the regulations in a fair manner with emphasis on his rehabilitation and emphasis on achieving some semblance of proportionality in setting an appropriate term"—does not call for any further analysis with respect to the suitability determination.

## B.

Petitioner also argues that he is serving an excessive and disproportionate term because the length of time he has already served exceeds the base term called for under either the ISL or the DSL. The base term (referred to as the "base period of confinement" under the ISL) is the part of an inmate's prison term that is solely determined by the gravity of the offense for which the life term was imposed.  (Regs., § 2282, 2320.) "[T]he setting of the base term is designed to ensure life prisoners do not serve terms disproportionate to the culpability of the individual offender." (*Stoneroad, supra,* 215 Cal.App.4th at p. 617.)  The "measure of the constitutionality of punishment for crime is individual culpability," as reflected in "the circumstances existing at the time of the offense." (*In re Rodriguez* (1975)14 Cal.3d 639, 652-653.)  Setting a base term is necessary because, while "[t]he specific criminal acts proscribed by the Penal Code

---

[13] As *Stanworth* summarized the differences between the sentencing schemes, "the new regulations set a longer range of base terms for first degree murder and require the imposition of set additional terms for particular enhancements unless deviation from the norms is expressly justified.  Moreover, the new rules generally reflect an attempt to achieve uniformity and stress the criminal activities of the inmate rather than any social or personal factors." (*Stanworth*, supra, 33 Cal.3d at p. 186.)

ordinarily 'prohibit[] a wide range of culpable conduct, with a correspondingly wide range of punishment' " (*Stoneroad,* at pp. 617-618, quoting *People v. Wingo* (1975) 14 Cal.3d 169, 176 (*Wingo*)), imprisonment for a period "grossly disproportionate" to the prisoner's "individual culpability for the commitment offense" would violate the cruel or unusual punishment clause (art. 1, § 17) of the California Constitution. (*Dannenberg, supra,* 34 Cal.4th at p. 1096.) While other factors—such as postconviction institutional conduct—properly bear on the sentence a life prisoner ultimately serves, the setting of the base term keeps the prison term tethered to the prisoner's culpability for the commitment offense.

In arguing that his term is constitutionally disproportionate, petitioner points to the regulations in effect at the time of his crimes, which set the "suggested range" for the base period of confinement for first degree murder at 96 to 156 months (eight to 13 years) (former 15 Cal. Admin. Code, § 2225 [Cal. Admin. Register 76, No. 21-B, May 22, 1976] [(1976 Regs.)], and the currently effective regulations, which set the base term for first degree murder at a low of 25, 26 or 27 years and a high of 31, 32 or 33 years (determined according to a matrix of circumstances pertaining to crime) (Regs., § 2403, subd. (b)).[14] As we have said, at the time of the current parole hearing, petitioner had served 36 years in prison.

Petitioner's claim assumes that the base term—whether considered under the ISL or the DSL—is the full measure of a sentence proportionate to his crime, and that his incarceration beyond the base term necessarily amounts to a disproportionate and excessive sentence. But petitioner ignores the fact that, under both sentencing schemes, the base term is a beginning point in calculating when a prisoner will be released from

---

[14] The specific regulations petitioner refers to are contained in a section governing parole for prisoners sentenced for first and second degree murders committed on or after November 8, 1978 (Regs., §§ 2400-2411). Current regulations include distinct provisions governing parole for these post-1978 prisoners, for life prisoners whose crimes were committed prior to July 1, 1977 (Regs., §§ 2280-2292), and for prisoners sentenced under the ISL (Regs., §§ 2300-2373).

prison; various adjustments to the base term bear on the period of confinement the regulations call for the Board to determine.  (Regs., § 2411; 1976 Regs., § 2350-2351.)[15] In any event, the fact that a prisoner has served a sentence longer than the statutory base term does not in and of itself establish a constitutional violation, and petitioner has provided us with no evidence upon which to base a conclusion that the term he has served thus far is so disproportionate to his individual culpability as to violate constitutional guarantees.  (See *Rodriguez, supra,* 14 Cal.3d at pp. 653-656 [22 years served for conviction of lewd and lascivious conduct held constitutionally disproportionate upon consideration of factors set forth in *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*):  nature of offense and offender, sentences provided in California for more serious offenses, and sentences provided in other jurisdictions for same offense; *Morganti, supra,* 204 Cal.App.4th at p. 943, conc. & dis. opn. of Kline, J. [prisoner sought discovery to make claim that Board policy of systematic denial of parole to life prisoners resulted in constitutionally disproportionate periods of confinement].)

While insufficient to entitle him to immediate release, petitioner's focus on the base term is important, as it points to the significance of the base term determination in

---

[15] The DSL provides that an inmate's "adjusted period of prison confinement" consists of the base term plus "any adjustments," less pre- and postconviction credit. (Regs., § 2411.)  Adjustments are specified for using or being armed with weapons, causing great loss, having served a prior prison term (Regs., § 2406), and having multiple convictions (Regs., § 2407).  For example, if the trial court imposed consecutive life sentences, the Board "shall" add adjustments for the remaining life crimes, while if the court imposed concurrent life sentences, the Board "may" add an adjustment due to the other crime (Regs., § 2407, subds. (b)(2), (b)(3)).  Postconviction credit is granted (or denied) based upon the prisoner's institutional conduct  (Regs., § 2410).

Under the ISL, a prisoner's "total period of confinement" consisted of the "base period of confinement" plus "adjustments," including any administrative credits.  (1976 Regs., § 2350-2351.)  The adjustments provided for in the ISL included preconviction factors such as criminal history and social factors (1976 Regs., § 2354), commitment factors, including commission of multiple crimes and sentencing status (1976 Regs., § 2355), and postconviction prison conduct (1976 Regs., §§ 2356, 2392).  The total period of confinement could be increased or decreased after hearings (1976 Regs., § 2351).

ensuring the constitutional proportionality of an individual inmate's sentence. Petitioner's base term (or base period of confinement) has never been established because the Board's present regulations provide that the base term (or base period of confinement) is not to be set until an inmate is found suitable for parole. (Regs., § 2282, 2317.) This is despite the fact that because the base term and base period of confinement are based "solely on the gravity of the base offense" (Regs., §§ 2282, 2320 ["base crime"]), they can easily be set at the outset of a prisoner's incarceration, as *Rodriguez* directed, when the relevant information is available and fresh. (*Stoneroad, supra,* 215 Cal.App.4th at pp. 618-619.) The current procedure raises the specter of exactly the situation *Rodriguez* aimed to eliminate, in which a prisoner's parole date would never be set because he or she continued to be found unsuitable for parole and, at some point, the resulting term of incarceration might become so disproportionate to individual culpability as to be unconstitutional. Our Supreme Court has recognized that even reasons of public safety cannot authorize continued incarceration beyond the "constitutional maximum period of confinement." (*Dannenberg, supra,* 34 Cal.4th at p. 1096.)

It is useful to briefly describe the many judicial, legislative, and administrative actions that have been taken during the last four decades concerning proportionality in sentencing.

By the 1970s, the rehabilitative goals of the ISL were no longer considered efficacious. The subjectivity of any in-prison assessment of rehabilitation and the uncertainty of indeterminate sentences were seen as obstructive of rehabilitation and a cause of violence in prison; and gross disparities in terms fixed for offenders who had committed comparable crimes were perceived as unwarranted, unjust and unnecessary. (Cassou & Taugher, *supra,* 9 Pacific L.J. 5 at pp. 10-11.) At the same time, as a result of *Morrissey v. Brewer* (1972) 408 U.S. 471 (*Morrissey*), the procedural protections declared by the United States Supreme Court in *Goldberg v. Kelly* (1970) 397 U.S. 294 were introduced into the postconviction sentencing process. By subjecting revocations of parole to the requirements of the due process clause, *Morrissey* stimulated state judicial

inquiry into the parole process that defined the nature of punishment imposed under the ISL; specifically, whether the uncertainty and range of indeterminate terms allowed the imposition of cruel and unusual punishment within the meaning of the Eighth Amendment.

In *Lynch, supra,* 8 Cal.3d 410 and *In re Foss* (1974) 10 Cal.3d 910, the California Supreme Court introduced the concept of proportionality as a means of determining whether the denial of parole resulted in a sentence that constituted cruel and usual punishment. Application of this criterion was, however, problematical. As recognized by the Supreme Court in *Wingo, supra,* 14 Cal.3d 169 and *People v. Romo* (1975) 14 Cal.3d 189, the proportionality of an indeterminate term could not be reviewed unless and until it had been fixed by the parole authority (then the Adult Authority), which did not engage in term-fixing until it first determined the inmate was rehabilitated and therefore suitable for release. In *Rodriguez, supra,* 14 Cal.3d 639, the Supreme Court attempted to eliminate this problem.

As pointed out in *Morganti, supra,* 204 Cal.App.4th 904, "[t]he judicial concern in *Rodriguez* was that the Adult Authority was not complying with the legislative intention that it fix terms within the statutory range prescribed by the ISL 'that are not disproportionate to the culpability of the individual offender.' (*Rodriguez, supra,* 14 Cal.3d at p. 652.) The source of the problem, the court explained, was the authority's failure to recognize the difference between its responsibility to fix an inmate's 'primary term'—which should not be 'disproportionate to the culpability of the individual offender' and must 'reflect the circumstances existing at the time of the offense'—and its discretionary power to later reduce the term thus fixed, based on postconviction considerations, through exercise of its parole-granting function. (*Id.* at pp. 652-653.) Because it improperly conflated these separate and distinct functions, the Adult Authority did not fix an inmate's primary term until and unless it determined he or she was suitable for parole.' " (*Morganti,* at p. 939, conc. & dis. opn. of Kline, J.) As the *Rodriguez* court observed "[a] practice has evolved . . . in which customarily a term is fixed only in

36

conjunction with a grant of parole. . . . Thus a prisoner appears before a panel of the Authority for term-fixing only when his application for parole is considered, and as a general rule if he is denied parole no further consideration is given to the determination of his term." (*Rodriguez, supra,* 14 Cal.3d at p. 646.)  As a result of this practice, the petitioner in *Rodriguez*, like other prisoners, did not have his term fixed at a number of years proportionate to his offense at any time before his punishment became constitutionally excessive, which demonstrated that the ISL was "not . . . being administered in a manner which offers assurance that persons subject thereto will have their terms fixed at a number of years proportionate to their individual culpability [citation], or, that their terms will be fixed with sufficient promptness to permit any requested review of their proportionality to be accomplished before the affected individuals have been imprisoned beyond the constitutionally permitted term." (*Id.* at p. 650.)  Accordingly, the *Rodriguez* court required the parole authority to set a prisoner's "primary term" promptly after he or she entered prison, and to later, by granting parole, reduce the primary term in recognition of his "readiness to lead a crime-free life in society." (*Rodriguez*, at p. 652)  As the court noted, "[p]rompt term-fixing will not only serve to alleviate one of the causes of anxiety now affecting inmates, but will also prevent the intrusion of irrelevant post-conviction factors into the determination of the punishment that is proportionate to the offense of the particular inmate.  Prompt term-fixing will also enable the inmate who is aggrieved by what he believes to be an unconstitutionally excessive term to seek judicial review of the action by the Authority . . . [and] also make possible the type of meaningful review of Authority actions to which prisoners are entitled." (*Id.* at p. 654, fn. 18.)[16]

---

[16] In this connection, the court pointed out that "[w]ere unrepresented prisoners required to take the initiative by seeking relief at such time as they believed their continued imprisonment to be constitutionally impermissible, not only might abuses such as that in the instant case, and that in *Lynch*[, *supra*, 8 Cal.3d 410] recur, but courts would continue, as now, to receive inadequate petitions unaccompanied by necessary supporting data.  Since prison inmates understandably lack perspective as to the propriety of their continued incarceration, and also lack the ability to marshal the facts and applicable law

On September 2, 1975, about two months after *Rodriguez* was decided, the Adult Authority issued Chairman's Directive No. 75/30, entitled "Implementation of *In re Rodriguez.*" This directive emphasized that it was addressing procedures for "term fixing" and not the separate function of "parole granting," which would continue to be governed by a previous Chairman's Directive.[17] The new directive set forth procedures for fixing a "primary term," consisting of the base term plus adjustments (Chairman's Directive No. 5/30, § V.C), and including both time served in prison and time served on parole (*id.*, § I.) In setting the primary term, only information pertaining to the inmate's personal culpability for the commitment offense, past history and personality could be considered, not information concerning conduct "subsequent to the offense." (*Id.,* § IV.A.) The Directive stated that because prior to *Rodriguez* inmates' terms could be re-fixed based on events subsequent to the commitment offense, some inmates were currently "serving terms disproportionate to the commitment offense, based on their subsequent history" and would be "entitled to discharge under the new procedures." (*Id.,* § V.F.) Rehearings were required in approximately 40,000 cases in which *Rodriguez* required prompt term setting. (Cassou & Taugher, *supra*, 9 Pacific L.J. at p. 16, fn. 79.)

Regulations codifying the post-*Rodriguez* changes were adopted in 1976. (1976 Regs., §§ 2000-2725; see Cassou & Taugher, *supra*, 9 Pacific L.J. at p. 16, fn. 79.) The

---

in support of their claims, it is probable that courts would be burdened by a flood of meritless petitions. . . . Once the primary term is fixed by the Authority, however, all of the relevant data regarding the particular inmate, the circumstances of his offense, and the criteria on which the term is based will have been marshaled by the Authority, thus enabling petitioner to set out the basis or bases for his complaint, while at the same time providing the court with a record adequate to permit meaningful review." (*Rodriguez, supra*, 14 Cal.3d at p. 654, fn. 18.)

[17] Chairman's Directive No. 75/20, which issued on April 15, 1975, two and a half months prior to the *Rodriguez* opinion, was designed "[t]o establish procedures to apply to all parole consideration hearings." This directive stated that "[e]very effort will be made to establish parole and discharge dates the first time an inmate appears for his regularly scheduled parole consideration hearing" (§ A) and set forth the manner in which this should be done, including determination of the "base period of confinement" grounded primarily on the "seriousness of the commitment offense" (§ A.2.c.).

regulations called for the Adult Authority to set a "primary term," defined as "[t]he maximum term fixed by the parole board for adult felons committed to prison under an indeterminate sentence, including time credits and time served inside prison and on parole" (1976 Regs., § 2080) and "the maximum period of time which is constitutionally proportionate to the individual's culpability for the crime" (*id.*, § 2100, subd. (a)). The regulations expressly distinguished the "primary term" from "the parole release date fixed by the parole board, which determines the length of time to be served inside prison walls." (*Id.*, § 2100, subd. (a).) The primary term consisted of a "base term" reflecting the circumstances of the crime and inmate's culpability for it, and "adjustments for the individual's criminal history" (prior prison terms and current commitments). (*Id.*, § 2150.) The regulations provided suggested ranges of punishment for a given crime, with alternatives depending on whether the Adult Authority characterized the offense as "a 'typical' or 'aggravated' crime of that type," and suggested adjustment ranges. (*Id.*, §§ 2151, 2152, 2225, 2226bnbn.) Once fixed, the primary term could not be "refixed upward" unless the term was illegally fixed, a clerical error was made, or significant information was fraudulently withheld from the parole board. (*Id.*, § 2102, subd. (a).)

The term setting hearing, together with the inmate's first parole hearing, was to be scheduled for the earlier of one month before his or her minimum eligible parole date (MEPD) or the 12th month after reception. (1976 Regs., §§ 2125, subd. (a)(2), 2251.)[18] At this hearing, after the primary terms were fixed for each indeterminate sentence, the inmate would be evaluated for suitability for release on parole; if the inmate was found to pose an unreasonable risk of danger to society, parole would be denied; otherwise a "tentative parole release date would be established. (1976 Regs., §§ 2250, 2300, 2301.) The tentative parole release date would be set by determining the "total period of confinement," including the "base period of confinement" reflecting the seriousness of

---

[18] For an inmate whose MEPD was within 120 days of arrival in prison, the hearing was to be scheduled within 120 days of reception. (1976 Regs., § 2125, subd. (a).)

the base offense, "adjustment could be increased after a rescission hearing or decreased after a progress hearing. (*Id.*, § 2251.) The regulations set out general factors for the hearing panel to consider in determining the seriousness of the base offense, as well as specific aggravating and mitigating circumstances, and suggested ranges for various offenses. (*Id.*, §§ 2200-2202, 2225.)[19] These regulations comported with *Rodriguez* in that they required the primary term to be set before an inmate is actually considered for parole, thereby setting a limit on the inmate's term and providing a basis for judicial review, for example, if an inmate did not receive a parole release date because he or she continued to be found unsuitable for release.

The DSL became effective on July 1, 1977. (Stats. 1976, ch. 1139, § 273, p. 5140.) Although, as we have said, the DSL continues to prescribe indeterminate sentences for certain offenses, the parole authority, renamed the Community Release Board (CRB), apparently took the position that enactment of the DSL relieved it of the responsibility to promptly establish a "primary term" reflecting the maximum constitutionally proportionate sentence that could be imposed on a particular life prisoner.

Regulations published on July 9, 1977, set forth procedures governing parole for life (and other) prisoners under the newly enacted DSL and separate procedures governing parole for those who had been sentenced under the ISL. (Former 15 Cal. Admin. Code, §§ 2265-2329 [Register 77, No. 28-B, July-9-77] [(1977 Regs.)].) ISL prisoners were (and still are) to have a release date calculated under both the ISL procedures and the DSL procedures, and be released on the earlier of the two dates. (*Id.*, § 2300.) The timing of the initial parole hearing remained as under prior regulations (*id.*, § 2304, subd. (b)(2)), but there was no longer a term-setting hearing and the concept of the "primary term" no longer appeared in the regulations.[20] Instead, the regulations

---

[19] The suggested range for first degree murder was 7 years to life, with a suggested "base period" for parole of 8 to 13 years. (*Id.*, § 2225, subd. (a).)

[20] The regulations directed the Board to review the sentence of each prisoner shortly after prison entry to "determine whether the sentence imposed by the court is appropriate in light of available information" and, for DSL prisoners, "to eliminate

40

directed the hearing panel to "first determine whether the prisoner is unsuitable for parole" under specified criteria, and deny parole if the prisoner is found unsuitable. (*Id.*, §§ 2304, 2315, 2316.) If the inmate was found suitable, the parole authority was to set a tentative parole date as before, by establishing the total period of confinement composed of the base period of confinement and adjustments. (*Id.*, §§ 2304, subd. (a), 2318-2328.)[21] The regulations again set forth factors for the panel to consider in determining the seriousness of the offense (*id.*, § 2317) and suggested ranges for various offenses (*id.*, § 2329).[22]

For life prisoners sentenced under the DSL itself, the 1977 regulations provided: "A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing. At this hearing, a parole date shall normally be set. The parole date shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." (1977 Regs., § 2280) As with ISL prisoners, the first determination to be made was "whether the prisoner will at some time in the future be suitable for release." (*Ibid.*) Once a prisoner was found suitable for future release on parole, the hearing panel was to set a tentative parole date by first establishing the "total period of confinement," consisting of a "base period of confinement" reflecting the seriousness of the base offense and adjustments for

---

disparity of sentences and promote uniformity of sentencing." (Former 15 Cal. Admin. Code § 2100 [Register 77, No. 28-B, 9-9-77].) If the sentence imposed appeared disparate, the Board was to recommend to the court that it recall the sentence and resentence the prisoner. (*Id.*, § 2106.)

[21] One difference from the prior ISL regulations was that the total period of confinement was to be determined without inclusion of pre-prison credits, which were instead to be deducted from the total period of confinement (1977 Regs., § 2319, 2343, 2344.)

[22] In a section of the regulations pertaining to retroactive application of the DSL to ISL prisoners, an "offense chart" indicated, for first degree murder, an indeterminate sentence of 7 years to life. (1977 Regs., § 2166.) The regulation setting forth "suggested base ranges" for parole of ISL prisoners did not specify a "base period" for parole for first degree murder. (*Id.*, § 2329.)

41

enumerated preconviction, commitment and postconviction factors, and then deducting preprison credit. (*Id.*, §§ 2285-2295.) The regulations specified ranges (longer than those under the ISL) to guide the panel in determining the base period of confinement for a given offense (*id.*, § 2296),[23] examples of aggravating and mitigating circumstances, and factors relating to the prisoner (preconviction and postconviction) to be considered (*id.*, §§ 2282, 2283, 2284).

In essence, by deferring the setting of the total period of confinement until a tentative parole date was set, the 1977 regulations resurrected the pre-*Rodriguez* practice of not setting an inmate's "term" until he or she was found suitable for release on parole. A prisoner found to present a public danger would continue to be denied parole and no defined term would be set that would permit judicial review of the proportionality of the term. This remains the procedure under current regulations. (Regs., §§ 2280, 2282, 2304, 2317.)[24]

We are not aware of any official explanation for the CRB's departure from the practice mandated by *Rodriguez* for life prisoners after the enactment of the DSL. A post-hoc explanation, however, may be found in a memorandum sent by the Office of the Attorney General to all criminal deputies on August 22, 1979, but never made formally available to the public, concerning then newly-enacted sentences for first and second

---

[23] The suggested ranges for first degree murder were 92 to 108 months (lower), 109 to 132 months (middle) and 133 to 156 months (upper). (1977 Regs., § 2296, subd. (b).)

[24] Regulations adopted on August 5, 1978, introduced language that remains in current regulations, providing for determination of a "base term," to be established "solely on the gravity of the base offense, taking into account all of the circumstances of that crime" by reference to a matrix providing a triad of terms for a given offense depending on the circumstances in which it was committed. (Former 15 Cal. Admin Code, § 2282 [Register 78, No. 31-A, August 5, 1978] (1978 Regs.).) One axis of the matrix relates to the manner in which the offense was carried out and the other to the relationship between the prisoner and the victim and degree of threat to the public. (*Ibid.*) In the 1978 regulations, the terms for first degree murder ranged from a low of 8, 10 or 12 years to a high of 18, 20 or 22 years. (*Ibid.*)

degree murder.[25] The Attorney General viewed the sentences of 25 years to life for first degree murder and 15 years to life for second degree murder established by the 1978 Death Penalty Act (Pen. Code, § 190 et seq., added by Proposition 7, eff. 11/7/78) as " 'life' sentences with 15 and 25 year minimum eligible parole dates." (Memo at p. 1.) Because the Legislature had repealed the statute previously authorizing the Adult Authority to "fix and refix" terms of imprisonment, section 2940,[26] the Attorney General concluded that the Legislature had withdrawn the parole board's authority to "fix terms" and left it only the "power to grant parole." (Memo, at pp. 1-2.) Significantly, the

---

[25] The Attorney General's memorandum was an exhibit to the petition for writ of habeas corpus filed on December 10, 2012 by an inmate challenging the constitutionality of the Board practice of deferring calculation of the base term for life prisoners until after a finding of suitability for release. (*In re Butler*, Case No. 139411) After we issued an order to show cause in that case, counsel filed a supplemental petition that also challenged the Board order denying petitioner a parole release date. On August 7, 2013, we ordered bifurcation of the petition into two separate cases. Case No. 139411, which challenged the constitutionality of deferral of the setting of the base term, resulted in a Stipulation and Order regarding settlement filed on December 16, 2013. By its own terms, that settlement, which is described, *post*, at p. 47, became effective on March 5, 2014, the date we issued our published opinion in the associated case, *In re Butler* (2014) ___ Cal.App.4th ___ [2014 Cal. App. LEXIS 211]. Because the 1979 Memorandum of the Attorney General and our order regarding settlement are parts of a record of this court and relevant to the present matter, we take judicial notice of both documents. (Evid. Code, § 452, subd. (d).)

[26] Former Penal Code section 2940 provided, "Where the Adult Authority is authorized to fix and refix the term of imprisonment of a prisoner, such prisoner shall be discharged from custody upon the completion of said term so fixed or refixed and if the Adult Authority fails to fix the term of imprisonment the prisoner shall be discharged upon the completion of the maximum punishment provided by law for the offense for which the prisoner was convicted." Former Penal Code section 2941 provided, "Where the Adult Authority [was] not authorized to fix or refix the term of imprisonment of a prisoner such prisoner shall be discharged only upon the completion of the specified term fixed by law."

43

Attorney General took the position that because the parole authority no longer had the power to fix terms, *Rodriguez* had been rendered "obsolete." (Memo, at p. 3.)[27]

The conclusion of the 1979 memorandum, that repeal of section 2940 withdrew the parole board's authority to fix terms, is consistent with the enactment of the DSL *with respect to offenses for which the law specified determinate terms to be imposed by the sentencing court.* The same does not follow, however, as applied to *indeterminate* terms imposed under the DSL. For a prisoner sentenced to an indeterminate term, the decision to set a parole release date effectively fixes the term of punishment. As more recently recognized in *Dannenberg, supra,* 34 Cal.4th at page 1097, the setting of an indeterminate life prisoner's parole release date is "the equivalent of term-setting in such cases." (See Pen. Code, § 3041 ["Setting of parole release date"]; Regs., §§ 2289 ["Fixing a Parole Date: Computation," for life prisoners]; 2317 [Fixing a Parole Date: Criteria," for ISL prisoners]; 2411 ["Fixing a Parole Date" for murders committed on or after November 28, 1978].) *Dannenberg* took the view that in Penal Code section 3041, "the Legislature partially combined the term-setting and parole functions *Rodriguez* had described as separate under prior law. Under subdivision (a), firm parole release dates, fixed in advance under principles of uniform incarceration for similar offenses, would define the actual terms of imprisonment for eligible life prisoners. (See *Jefferson, supra,* 21 Cal.4th at pp. 95-96.) But subdivision (b) of the statute made clear that the parole authority would have the express power and duty, in an individual case, to *postpone* the fixing of a firm release date, and thus to continue the inmate's *indeterminate* status within

---

[27] The memorandum stated, "*In re Rodriguez*[, *supra*,] 14 Cal.3d 639, also appears to have been rendered obsolete by the changed structure of life sentences. In *Rodriguez*, the California Supreme Court placed the burden on the parole board to set a prisoner's 'primary term' quickly and without regard to any post-conviction behavior. This 'primary term' established the outer limit of the prison system's jurisdiction over the prisoner. The basis for the *Rodriguez* decision lay in the judicial branch's obligation to examine terms, as fixed by the parole board, to determine whether they were cruel or unusual. In light of the fact that the CRB has no term fixing power . . . *Rodriguez* is no longer applicable." (Memo, at p. 3.

his or her life-maximum sentence, if it found that the circumstances of the prisoner's crime or criminal history presented a continuing risk to public safety." (*Dannenberg*, at pp. 1090-1091.)

*Dannenberg* upheld the Board's authority to fix an indeterminate life inmate's sentence only after the inmate is found suitable for parole, finding that "the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders" and that the considerations underlying *Rodriguez* did not apply in the context of the DSL. (*Dannenberg, supra*, 34 Cal.4th at pp. 1084, 1096.) *Dannenberg,* however, was concerned primarily with the question whether the parole authority was required, before finding an inmate suitable for parole, to evaluate the inmate's offense for *uniformity* of sentence with other similar offenses. (*Id.* at p. 1069.)[28]

---

[28] Additionally, as noted in *Morganti, supra,* 204 Cal.App.4th at page 942, footnote 13, *Dannenberg* reached its conclusion on this point partly because when it was decided in 2005, "the number of inmates indeterminately sentenced was 'but a fraction' of the total prison population, which 'diminish[ed] the possibility that the Board's refusal, under [Penal Code] section 3041, subdivision (b), to set parole release dates in individual cases will result in the de facto imposition of constitutionally excessive punishment, or will overwhelm the courts' ability to assess claims of constitutional disproportionality.' (*Dannenberg, supra,* 34 Cal.4th at p. 1097.)"

In 2009, the number of indeterminately sentenced prisoners in California was 34,160, about one-fifth of the prison population. (*Morganti, supra,* 204 Cal.App.4th at p. 942, fn. 13, citing Nellis & King, No Exit: The Expanding Use of Life Sentences in America (The Sentencing Project, July 2009) p. 3.) "After the reduction in the size of the nonindeterminately sentenced prison population necessary to comply with the directive of the Supreme Court in *Brown v. Plata* (2011) 563 U.S. ___ [179 L.Ed.2d 969, 131 S.Ct. 1910] indeterminately sentenced prisoners will constitute close to one-third of the total population. The growth in the number of indeterminately sentenced prisoners in California is reflected in the fact that the number of such prisoners in 2009 was 56 percent greater than the total prison population in 1976, when the DSL was enacted, which was 21, 088. (Cal. Dept. of Corrections, Policy & Planning Div., California Prisoners 1977 and 1978, p. 5.)" (*Morganti, supra,* 204 Cal.App.4th at p. 942, fn. 13.) In 2012, the number of adult indeterminately sentenced life prisoners was 35,759 out of a total prison population of 133,883, or approximately 27 percent. (Nellis, Life Goes On: The Historic Rise in Life Sentences in America (The Sentencing Project, *supra*, at p. 6.)

While *Dannenberg* was willing to subordinate considerations of uniformity in sentencing to considerations of dangerousness and public safety, the court recognized that the *proportionality* of the sentence to an inmate's individual culpability could not be similarly subordinated. After explaining that *Rodriguez* does not relate to application of the *uniformity* provisions of the DSL, the court made clear that it *does* relate to implementation of the DSL insofar as it may interfere with *proportionality* in sentencing. (*Dannenberg, supra,* 34 Cal.4th at p. 1096.) Citing *Rodriguez*, the court stated that "[o]f course, even if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense. Such excessive confinement we have held violates the cruel and unusual punishment clause (art. I, § 17) of the California Constitution. (*Rodriguez*, *supra*, 14 Cal.3d 639, 646-656; *Wingo, supra*, 14 Cal.3d 169, 175-183.) Thus, we acknowledge, [Penal Code] section 3041, subdivision (b), cannot authorize such an inmate's retention, *even for reasons of public safety*, beyond this constitutional maximum period of confinement." (*Dannenberg,* at p. 1096, italics added.)

As we have said, the Board's practice of deferring calculation of an indeterminate life prisoner's total term of confinement until the prisoner is found suitable for parole creates the risk the prisoner may be confined for a period exceeding the constitutional maximum and undermines the ability of the judiciary to meet its responsibility of ensuring the proportionality of such inmates' sentences. Recently, however, the Board has agreed to alter this practice. In the judicial settlement referred to earlier in this opinion (fn. 26, *ante*), the Board and inmate stipulated to entry of an order of this court directing that "as soon as is practicable, the Board shall begin implementation of new policies and procedures that will result in the setting of base terms and adjusted base terms for life term inmates at their initial parole consideration hearing, or at the next scheduled parole consideration hearing that results in a grant of parole, a denial of parole, a tie vote or a stipulated denial of parole" and "the Board will commence rulemaking proceedings designed to memorialize and embody said new policies and procedures." (*In*

46

*re Butler,* A139411, Stipulation and Order Regarding Settlement filed December 16, 2013 [effective March 5, 2014].)  The new policies and practices contemplated by this Stipulation and Order are intended and expected to reintroduce into the parole process early consideration of the proportionality of life inmates' sentences, which would also facilitate judicial review of such sentences. In the present case, we are confident that, as a result of our vacating of the Board decision denying petitioner a parole release date, and ordering a new hearing, petitioner will have the benefit of this change and will have his base term and adjusted base term established.

## DISPOSITION

The petition for writ of habeas corpus is granted.  The Board of Parole Hearings is directed to vacate its November 28, 2011 parole decision and, consistent with *In re Prather, supra,* 50 Cal.4th 238, hold a new hearing and issue a new decision within 60 days of this order.

_____
Kline, P.J.


We concur:


_____
Richman, J.


_____
Brick, J.*


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

47

| | |
|---|---|
| Trial Court: | Marin County Superior Court |
| Trial Judge: | Hon. James T. Chou |
| Attorneys for Petitioner: | Jonathan Soglin, Executive Director<br>Frances M. Ternus, Staff Attorney<br>By Court Appointment Under the<br>First District Appellate Project |
| Attorneys for Respondent: | Kamala D. Harris, Attorney General<br>Jennifer A. Neill, Sr. Asst. Atty. Gen.<br>Sara J. Romano, Super. Dep. A.G.<br>Brian C. Kinney, Deputy Atty. Gen.<br>Denise A. Yates, Deputy Atty. Gen. |